75 F.3d 470
 Medicare & Medicaid Guide P 43,987,
43 Fed. R. Evid. Serv. 944,
96 Cal. Daily Op. Serv. 452,
96 Daily Journal D.A.R. 687
UNITED STATES of America, Plaintiff-Appellee-Cross-Appellant,
v.
Bruce L. ERICKSON and Great Falls Eye Surgery Center,
Defendants-Appellants-Cross-Appellees.
 Nos. 94-30207, 94-30210 and 94-30211.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted April 13, 1995.
Decided Jan. 22, 1996.
 
 W. William Leaphart, Leaphart Law Firm, Helena, Montana, for defendants-appellants-cross-appellees.
 Keith Strong and David Dennis, Dorsey & Whitney, Great Falls, Montana, for defendants-appellants-cross-appellees.
 Carl Rostad, Assistant United States Attorney, Great Falls, Montana, for plaintiff-appellee-cross-appellant.
 Appeals from the United States District Court for the District of Montana.
 Before: POOLE, BOOCHEVER, and WIGGINS, Circuit Judges.
 POOLE, Circuit Judge:
 
 
 1
 The Great Falls Eye Surgery Center (the "Center") and ophthalmologist Bruce L. Erickson, a part-owner and the medical director of the Center, appeal their convictions for Medicare fraud in violation of 18 U.S.C. § 287. They were convicted after jury trial of knowingly and willfully over-billing their patients and the Department of Health and Human Services ("DHHS") from July 23, 1992 through June 1993 for services provided by their certified registered nurse anesthetists ("CRNA's"). They now claim that the district court committed various errors which, separately and in combination, deprived them of a fair trial. The government cross-appeals their sentences. We have jurisdiction pursuant to 28 U.S.C. § 1291. We affirm the convictions and remand for specific sentencing.
 
 I. FACTS
 
 2
 Bruce L. Erickson is a licensed ophthalmologist in Montana. Dr. Erickson practiced at and is a 50% shareholder and the medical director of the Great Falls Eye Surgery Center in Great Falls, Montana. The Center is an ambulatory surgery center incorporated in December 1988. The Center began performing operations in early 1989. The Center is an approved Medicare provider whose claims are processed through an intermediary, Blue Cross/Blue Shield of Montana ("BC/BS"). The vast majority of the Center's practice involves performing cataract surgery on senior citizens covered by Medicare. Medicare pays 80% of the patients' costs; the patients have a 20% co-payment.
 
 
 3
 The Center hires CRNA's to administer anesthesia to patients undergoing surgery and to monitor those patients. The Center has used three methods to bill for CRNA services.
 
 
 4
 Initially, the Center contracted with a CRNA named Gary Andregg. Mr. Andregg testified at trial that he handled the billing for anesthesia services until January 1990, when he asked the Center to take over the billing of anesthesia services. He billed patients for the concurrent services provided by CRNA's when patients were "staged in," with several patients blocked at the same time in preparation for surgery.
 
 
 5
 Dr. Erickson testified that he was not in any way involved in any determination of how the Center would bill for anesthesia services. In January 1990, Dr. Erickson asked bookkeeper Diane Boland to look into the procedure for the billing of anesthesia services. Ms. Boland testified at trial that she contacted BC/BS, but had difficulty obtaining the information she needed regarding anesthesia base units (the base amount of time Medicare allowed for anesthesia services). She had to file a Freedom of Information Act request to obtain that information. She commenced billing Medicare in the same manner as Mr. Andregg. In January 1992, bookkeeper Jeryl Robinson took over Ms. Boland's billing responsibilities. She testified at trial that she received training from Ms. Boland, who told her to take the starting and ending anesthesia times for a patient from the patient's billing chart. She never received instructions from Dr. Erickson, but followed the system then in place.
 
 
 6
 On January 9, 1991, the Health Care Financing Administration ("HCFA") assigned Agent Alfonso Gomez to investigate the Center's billing practices. Agent Gomez studied 25 randomly selected Medicare claims submitted by the Center, and found that the Center billed Medicare for overlapping CRNA services. The Center billed as many as 27 hours for the services of a single CRNA in a ten-hour workday. On July 22, 1992, Agent Gomez went to the Center and interviewed Dr. Erickson and other Center personnel. Agent Gomez informed Dr. Erickson that the Center's method of billing for concurrent CRNA services was not permissible under Medicare regulations. Agent Gomez testified that he was fairly certain that he told Jeryl Robinson the correct way to bill. Ms. Robinson testified that Agent Gomez could not tell her how to bill correctly. She claimed that he told her to contact a local carrier, but could not give her the name of a particular person there who could help her. When she called BC/BS, an agent informed her that the carrier was instructed by Agent Gomez not to speak to anyone at the Center.
 
 
 7
 Ms. Robinson and Agent Gomez offered two different accounts at trial of the Center's billing practices after July 1992. Ms. Robinson testified that at Dr. Erickson's request, she called the Eye Institute of Utah ("EIU") for billing advice. She testified that she then altered the Center's billing procedure to conform to EIU procedure. She began billing patients for anesthesia time in two blocks--one for anesthesia and one for surgery. She said that she added the total number of minutes in each block to arrive at a single anesthesia time for which she submitted a Medicare claim. Ms. Robinson testified that the total time billed by the Center went down as a result of this change.
 
 
 8
 Agent Gomez offered a different explanation of the Center's anesthesia billing practices after July 1992. According to Agent Gomez, the Center ceased billing patients for overlapping CRNA services, but continued to bill patients for periods that exceeded the actual time a CRNA spent with a single patient. The Center began billing for CRNA services in continuous back-to-back blocks, with the anesthesia time for one patient beginning immediately after the anesthesia time for another patient had ended. Agent Gomez indicated that the inflated anesthesia billing periods probably included periods when the patient was away from the CRNA under pre- or post-operative care. He testified that he instructed Dr. Erickson that these pre- and post-operative intervals were ineligible for anesthesia billing where patients were scheduled for consecutive surgeries. He claimed that he told Dr. Erickson that he could bill for five minutes of CRNA services during the pre- and post-operative periods only in cases where an adjacent surgery was not scheduled.
 
 
 9
 In the summer of 1993, Dr. Erickson and the Center were indicted for one count of mail fraud from January 1990 through June 1993 in violation of 18 U.S.C. §§ 1341 and 1343, and two counts of Medicare fraud in violation of 18 U.S.C. § 287 (False Claims).[1] They were indicted for knowingly and willfully devising an inflated Medicare billing scheme using the federal mail to obtain reimbursements for CRNA services that exceeded those to which they were legally entitled.
 
 
 10
 A jury trial was held from March 7 through March 12, 1994. The jury reached no verdict on counts I and II, and the district court declared a mistrial on those counts. The jury found Dr. Erickson and the Center guilty on Count III. At a sentencing hearing on May 31, 1994, the district court departed downward from the United States Sentencing Guidelines and sentenced Erickson to two months imprisonment, four months home detention, and three years of supervised release, along with a fine of $50,000. The district court sentenced the Center to serve three years probation and to pay restitution of $11,910 and a fine of $225,549.
 
 
 11
 Erickson and the Center appeal their convictions. The United States appeals their sentences. Counts I and II are in stipulated abeyance pending this appeal. Erickson was released on bail pending the appeal.
 
 II. VAGUENESS OF THE GOVERNING REGULATION
 
 12
 Appellants claim that the governing regulation is unconstitutionally vague. The regulation, which governs billing for anesthesia services, provides:
 
 
 13
 Time units involve the continuous actual presence of the physician (or of the medically directed qualified anesthetist or resident) and start when he or she begins to prepare the patient for anesthesia care and ends when the anesthesiologist (or medically directed CRNA) is no longer in personal attendance, that is, when the patient may safely be placed under post-operative care.
 
 
 14
 42 C.F.R. § 414.46(a)(2) (1993).
 
 
 15
 The district court instructed the members of the jury to find the defendants guilty on Count III if they found that the defendants knowingly and willfully
 
 
 16
 submitted or caused to be submitted, for Medicare payment, claims for anesthesiological services, well knowing that those claims, while not reflecting overlapping patient attendance, were false and fraudulent, in that they were demands for payment of anesthesia services that were, in whole or in part, not rendered by a physically present provider and were, therefore, not allowable under the regulations providing for Medicare reimbursement, alleged to be in violation of Title 18 U.S.C. § 287.
 
 
 17
 Appellants claim that the term "continuous actual presence" is ambiguous because it does not define a degree of proximity to the patient. The issue before us is whether the phrase "continuous actual presence" can be held to refer clearly to a continually physically present provider.
 
 
 18
 Whether a regulation is unconstitutionally vague is a question of law subject to de novo review. United States v. Emerson, 846 F.2d 541, 545 (9th Cir.1988); United States v. Christopher, 700 F.2d 1253, 1258 (9th Cir.), cert. denied, 461 U.S. 960, 103 S.Ct. 2436, 77 L.Ed.2d 1321 (1983). A penal regulation is void for vagueness unless it " 'define[s] the criminal offense with sufficient definiteness that ordinary people can tell what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.' " United States v. Stansell, 847 F.2d 609, 615 (9th Cir.1988) (quoting Kolender v. Lawson, 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983)). A regulation is not unconstitutionally vague if that regulation is capable of a limited interpretation such that "(1) ordinary people could understand what conduct is prohibited, and (2) those enforcing the law are provided with clear standards to constrain them." United States v. Talbot, 51 F.3d 183, 188 (9th Cir.1995). In the field of regulatory statements governing business activities, greater leeway is allowed. Papachristou v. City of Jacksonville, 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31 L.Ed.2d 110 (1972).
 
 
 19
 When placed in context, this regulation is not unconstitutionally vague as to Count III of the indictment. On its face, the regulation clearly limits CRNA reimbursement to periods when the CRNA is actually with and looking after the patient. The regulation requires "personal attendance" that is said to cease when the patient is placed under the care of another.
 
 
 20
 The trial testimony supports this view. The government called nine ophthalmologists, CRNA's, nurse anesthetists and billing consultants who testified that continuous actual presence as defined in the regulation meant uninterrupted attendance to one patient at a time. Appellants argue that the district court erred by admitting the testimony of all nine witnesses, claiming that the interpretation of a regulation is a question of law for the district court, not a factual matter left up to experts.
 
 
 21
 The district court did not qualify these witnesses as experts, however. They testified as lay witnesses regarding industry practices and the common understanding of billing instructions after the district court made its decision not to dismiss the indictment on vagueness grounds. The district court's decision balancing the probative value of this evidence against its prejudicial effect is reviewed for abuse of discretion. United States v. Kessi, 868 F.2d 1097, 1107 (9th Cir.1989). The district court did not abuse its discretion in admitting their testimony, which was relevant to appellants' claims of mistake and lack of knowledge and intent. See United States v. Mayans, 17 F.3d 1174, 1181-82 (9th Cir.1994).
 
 
 22
 Appellants argue that the regulation does not clearly state what is prohibited because an article in the November 1992 trade journal of the American Association of Nurse Anesthetists ("AANA") indicates that:
 
 
 23
 the nature of anesthesia practice in [ophthalmologic surgery centers], with its emphasis on preoperative blocking of patients and the possibility of having several patients blocked at the same time, may have resulted in some confusion about Medicare billing.[2]
 
 
 24
 Ira Gunn and Dan Simonson, Alert to All CRNA's Regarding Fraudulent Billing for Concurrent Cases, AANA News Bulletin, Nov. 1992.
 
 
 25
 Appellants' argument is unconvincing. Two paragraphs later, the article clears any existing confusion by explaining that:
 
 
 26
 the CRNA may only bill for that period of time in which he or she is in continuous personal attendance to the patient. The AANA position has always been that a CRNA may not bill for anesthesia time for more than one patient at a time because personal attendance means exclusively one-patient care. In other words, even if several patients are blocked, the CRNA may bill for only one patient at a time.
 
 
 27
 Id. This article does not support appellants' contention that "continuous actual presence" is capable of a loose definition that allows a CRNA to bill for anesthesia services even where the CRNA is not continually with the patient. If anything, the article shows that appellants had knowledge of the continuous actual presence requirement and acted contrary to that knowledge.[3]
 
 
 28
 For these reasons, appellants' contention that the government regulation is unconstitutionally vague is rejected.
 
 III. JURY SELECTION
 
 29
 Jury selection began with a pool of 34 potential jurors from the Great Falls Division of the District of Montana. As voir dire progressed, some potential jurors were excused for cause and each side exercised some peremptory challenges. As the pool of potential jurors dwindled, the government noted that it would be difficult to find a jury locally that did not know Dr. Erickson or other doctors at the Center. The court decided to call additional venirepersons to the pool. The court proposed that the clerk be instructed to pull additional venirepersons from the pool of qualified jurors in the district, limited to a radius of 25 miles outside of Great Falls. Appellants objected to the 25 mile limit and requested that the venirepersons be drawn from the entire panel. The judge denied appellants' request because it would postpone the trial for at least a day while the venirepersons were brought to Great Falls. The existing jury panel was excused for lunch while the additional venirepersons were summoned. During this recess, the government asked the judge to dismiss the entire panel because one perspective juror reported that her niece, a receptionist at the Center, said that Dr. Erickson "did not do it." The defense objected, and the district court denied the motion.[4]
 
 
 30
 Pursuant to the Jury Selection and Service Act of 1968, 28 U.S.C. §§ 1861-1869, federal criminal defendants have the right to "grand and petit juries selected at random from a fair cross section of their community in the district or division where the court convenes." 28 U.S.C. § 1861. See also United States v. Nelson, 718 F.2d 315, 318 (9th Cir.1983). A statutory challenge is allowed only for "substantial failure to comply with the Act." Nelson, 718 F.2d at 318 (quoting 28 U.S.C. § 1867(a)). Technical violations are insubstantial where they do not frustrate the Act's goals of obtaining jury lists that are a cross-section of the community, allocating jury duty fairly among the citizenry, and determining disqualifications, excuses, exemptions and exclusions on the basis of objective criteria only. Id. at 318; United States v. Calabrese, 942 F.2d 218 (3d Cir.1991); see 28 U.S.C. § 1862 (prohibiting discrimination in selection of jury pool).
 
 Section 1866(f) governs juror shortages:
 
 31
 Where there is an unanticipated shortage of available petit jurors from the qualified jury wheel, the court may require the marshal to summon a sufficient number of petit jurors selected at random ... in a manner ordered by the court consistent with §§ 1861 and 1862 of this title.
 
 
 32
 Appellants argue that the district court substantially violated the Act by excluding four Indian reservation lands that were outside the 25 mile radius. Appellants have failed to make out a prima facie case of discrimination. To establish a prima facie violation of the fair cross-section requirement, appellants must show (1) that the excluded group is a "distinctive" group in the community; (2) that the representation of this group in venires is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under-representation is due to systematic exclusion of the group in the jury selection process. Duren v. Missouri, 439 U.S. 357, 364, 99 S.Ct. 664, 668-69, 58 L.Ed.2d 579 (1979). Appellants have offered no proof as to the second element of this test. Even if appellants could prove the second element, however, they could not establish a systematic pattern of exclusion. Id. at 366, 99 S.Ct. at 669-70. An occasional discrepancy, such as the measure taken in this case for the sake of expediency, does not establish a prima facie violation. Id. Therefore, appellants' challenge to the district court's method of jury selection is rejected.
 
 IV. PRIOR BAD ACTS EVIDENCE
 
 33
 Dr. Erickson worked for Dr. Amicucci at St. Peter's Hospital from 1984 through 1986. Over repeated objections by the defense, the district court allowed four witnesses, Dr. Olson, Margaret Ernst, Lisa Murphy and Irene Duke, to testify regarding Dr. Erickson's billing practices while he was employed at St. Peter's.[5] Their testimony revealed that while Dr. Amicucci was away on sabbatical, Dr. Erickson instituted a practice of "fragmenting" or "unbundling." Rather than billing each patient for the entire procedure he performed, he billed each patient for the separate components of the procedure, at a higher cost to that patient and the patient's insurer. He also billed patients for services he never provided. In the spring of 1985, St. Peter's suspended Dr. Erickson's privileges to practice and placed him on probation for one year.
 
 
 34
 In 1986, Dr. Olson, an ophthalmologist and professor at the Utah School of Medicine, was asked to chair a three-person outside investigatory committee to determine whether Dr. Erickson's privileges should be reinstated. The committee held a hearing in which it questioned Dr. Erickson. The written record of the hearing is limited to notes taken and signed by the three committee members, and a report that Dr. Olson made from those notes. Dr. Erickson admitted to the committee that he had billed patients for services not rendered, but that he had decided to stop this practice two months earlier. He admitted that he billed patients for services he had not performed in order to "get better reimbursement for patients." Dr. Olson testified that he understood this comment to mean that Dr. Erickson billed as he did to make more money, since under Medicare, reimbursement goes to the doctor and not the patient.
 
 
 35
 Dr. Erickson did not directly address his unbundling practices before the committee. The committee, however, reviewed Dr. Erickson's billing records and found many examples of how Dr. Erickson billed for each part of a single procedure, rather than billing for the entire procedure at a lower rate. The committee decided to suspend Dr. Erickson's privileges as a result of this investigation.
 
 
 36
 The district court instructed the jury that Dr. Olson's testimony applied only to Dr. Erickson, and not to the Center, which came into existence after the 1986 investigation. The district court did not give similar limiting instructions following the testimony of Ms. Ernst, Ms. Murphy and Ms. Duke. Originally, the district court agreed to give the jury a limiting instruction to the effect that Dr. Olson's testimony went to intent or absence of mistake, but was not admitted for the truth of the matter asserted. Later, however, the judge informed the parties that he would not give such a limiting instruction because Dr. Olson relayed admissions of a party, which are exceptions to the hearsay rule.
 
 
 37
 Dr. Erickson makes four arguments that this prior bad acts evidence was wrongly admitted. First, he argues that these acts should not have been admitted because they were not proven to be criminal. This contention is wrong. Fed.R.Evid. 404(b) explicitly allows evidence of other crimes, wrongs or acts to show proof of knowledge, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident. See also Estelle v. McGuire, 502 U.S. 62, 69, 112 S.Ct. 475, 480-81, 116 L.Ed.2d 385 (1991).
 
 
 38
 Next, Dr. Erickson argues that the testimony was inadmissible because it was oral rather than written. This argument also fails. Rule 404(b) does not require written evidence, and courts have allowed the oral testimony of witnesses with personal knowledge of prior bad acts where no formal written evidence is available. See, e.g., United States v. Hill, 953 F.2d 452, 456 (9th Cir.1991) (witness presented oral evidence of defendant's prior drug use).
 
 
 39
 Third, Dr. Erickson claims that the government did not give him pretrial notice under Rule 404(b) of its intent to use Dr. Olson's testimony that Dr. Erickson charged Medicare for services not rendered. Rule 404(b) requires "reasonable notice in advance of trial ... of the general nature of any [Rule 404(b) ] evidence [the government] intends to introduce at trial. This contention fails. The government satisfied the requirement by turning over to appellants prior to trial Dr. Olson's statements that Dr. Erickson billed for services not rendered, practiced unbundling, and billed for services not listed on patients' charts. Dr. Erickson's attorneys had pretrial notice of Dr. Olson's potential testimony, though they did not know specifically what testimony the government planned to use. Dr. Erickson had sufficient notice. Moreover, Dr. Erickson was not prejudiced by any lack of notice. At trial, Dr. Erickson's attorneys said that they had no notice that this evidence would be used, but "would be prepared to meet it."
 
 
 40
 Finally, Dr. Erickson argues that the district court erred by electing not to give the additional limiting instruction following Dr. Olson's testimony. Whether the district court correctly construed the hearsay rule is a question of law reviewed de novo. United States v. Warren, 25 F.3d 890, 895 (9th Cir.1994). Fed.R.Evid. 801(d)(2)(A) provides that "a statement is not hearsay if ... the statement is offered against a party and is ... the party's own statement." The district court correctly ruled that Dr. Erickson's statements to Dr. Olson were admissions of a defendant and, as such, were exceptions to the hearsay rule.
 
 
 41
 The Center also argues that the district court erred by failing to give the jury a limiting instruction following the testimony of Ms. Ernst, Ms. Murphy and Ms. Duke. The Center is correct. Evidence of a defendant's prior bad acts is admissible only against that defendant. See Huddleston v. United States, 485 U.S. 681, 685, 108 S.Ct. 1496, 1499, 99 L.Ed.2d 771 (1988). However, this error was harmless. Errors which do not rise to constitutional dimensions are harmless if it is more probable than not that the error did not affect the jury's verdict. Hill, 953 F.2d at 458. In the instant case, it is unlikely that the district court's omission affected the jury's verdict. The attorney for the Center easily established on cross-examination that the acts described all occurred several years before the creation of the Center. Moreover, the evidence served another purpose in the trial--to illustrate Dr. Erickson's intent, knowledge and lack of mistake. See McGuire, 502 U.S. at 69, 112 S.Ct. at 480-81.
 
 
 42
 V. VOLUME OF BUSINESS GENERATED BY THE CENTER
 
 
 43
 The district court allowed testimony that appellants received between $1.3 and 1.9 million per year from Medicare for each of the years in question. Appellants argue that this was error because a large portion of those payments was for non-anesthesia charges which are irrelevant to this case. The government argues that the numbers were offered to show the volume and sophistication of the operation and to negate appellants' claims of mistake and lack of knowledge or intent.
 
 
 44
 Appellants also claim that the district court erred by allowing testimony that the number of cataract surgeries in the Great Falls area increased dramatically following the 1989 opening of the Center. Appellants argue that this information is not relevant to anesthesia services.
 
 
 45
 We review the district court's decisions balancing the probative value of evidence against its prejudicial effect for abuse of discretion. Kessi, 868 F.2d at 1107. The district court did not abuse its discretion in allowing the evidence of revenue and of the number of operations performed. It was within the court's discretion to determine that this evidence revealed the sophistication of the operation and was relevant to appellants' defenses of mistake and lack of knowledge and intent to commit Medicare fraud. See United States v. DeSalvo, 41 F.3d 505, 509-510 (9th Cir.1994).
 
 VI. RECALL OF WITNESSES
 
 46
 The government recalled two witnesses, Julie Eby and Marsha Vanderhoff, who remained in the courtroom after their initial testimony.
 
 
 47
 Ms. Eby, an employee of the fraud and abuse unit of BC/BS, reviewed appellants' file during Agent Gomez' investigation of their billing practices. The government used this witness to lay a foundation for her investigation notes and the records she received during the investigation. When the district court released her, the judge told her she was "free to go" or "welcome to stay." Neither side objected. She remained in the courtroom during the testimony of four witnesses including Agent Gomez (who was recalled later) and Betty Hibbert, a manager of accounting systems for BC/BS of Montana. Agent Gomez testified regarding Exhibit 4, a computer printout of monies paid to the Center from 1990 through 1992. Payments were divided into three categories--a surgery fee, a facility fee, and an anesthesia fee.
 
 
 48
 The government used Ms. Hibbert's testimony to lay a foundation for Exhibit 4. Ms. Hibbert testified that she retrieved 1991 billing reports off the computer for Agent Gomez, and had access to and had seen the 1990 and 1992 reports. The government attempted to introduce all three reports as Exhibit 4. When the defense objected, the government decided to offer the 1991 report and to recall Julie Eby to lay a foundation for the 1990 and 1992 reports. The court refused to exclude Ms. Eby's testimony on recall. She testified that monthly payment reports were generated automatically by the computer. She gathered the reports for 1989, 1990 and 1992 and supplied them to Agent Gomez. The court admitted the 1990 and 1992 reports as well as the rest of Exhibit 4.
 
 
 49
 Marsha Vanderhoff, a manager of public and provider relations for Medicare, testified that she ran workshops and wrote publications for Medicare providers to clarify Medicare policies and regulations. In early 1989, she distributed a memo regarding the reduction of base units for physicians concurrently directing two or more nurse anesthetists. She was released and told by the judge that she was "free to go" or "welcome to stay." No party objected. She remained in the courtroom for approximately one hour of the government's case, although the government had asked her to remain outside the courtroom. The district court refused appellants' motion to exclude her testimony on rebuttal. She testified that she put on annual Medicare workshops, and that her records showed that Dr. Erickson and a staff member signed in to two of those workshops. She also said that Agent Gomez told her to route all billing questions concerning the Center to him after July 1992.
 
 
 50
 A district court's control over the examination of witnesses at trial is reviewed for an abuse of discretion. United States v. Torres-Rodriguez, 930 F.2d 1375, 1384 (9th Cir.1991).
 
 
 51
 The district court did not abuse its discretion when it allowed these witnesses to be recalled. Exclusion of a witness is a strongly disfavored sanction. United States v. Hobbs, 31 F.3d 918, 921-22 (9th Cir.1994).[6] Moreover, the testimony of Ms. Eby and Ms. Vanderhoff was not cumulative and was relevant. Id. at 922. Ms. Eby laid a foundation for a computer-generated report based on her dealings with the report. It is unlikely that she would have testified differently on this subject had she been absent during the earlier testimony. Ms. Vanderhoff testified that Dr. Erickson and a staff member signed in to two of her annual Medicare billing workshops. This relevant testimony likewise presents a small danger of contamination. Ms. Vanderhoff also testified regarding her conversation with Agent Gomez regarding billing inquiries. Appellants allege that she tailored this testimony on rebuttal to smooth over the inconsistencies in the testimony of Agent Gomez and Jeryl Robinson. Rather than moving to exclude her later testimony, appellants should have remedied any error occurring from this influence on her testimony through the usual remedy of cross-examination. Id. at 922.
 
 
 52
 Appellants' challenges to the district court's handling of these rebuttal witnesses are rejected.
 
 VII. CROSS-EXAMINATION OF DEFENSE WITNESSES
 
 53
 Defense witness Jeryl Robinson testified that Dr. Erickson told her to call Dr. Lyle's office at the EIU for billing advice which she adopted in July 1992. On cross-examination, the government asked Ms. Robinson whether anyone at Dr. Lyle's office told her that the office had been under investigation in the mid-1980's for its billing practices, and that it later discontinued those practices. The defense objected to this question and requested a mistrial on the grounds that the question was deliberately prejudicial, that there was no reason for a bookkeeper to know about the investigation, and that there was no reasonable foundation for the question. The district court overruled the objection and refused to grant a mistrial.
 
 
 54
 A court's control over the manner of questioning at trial is reviewed for an abuse of discretion. United States v. Perkins, 937 F.2d 1397, 1405 (9th Cir.1991). The district court's decision denying a motion for mistrial is subject to an abuse of discretion standard. United States v. Homick, 964 F.2d 899, 906 (9th Cir.1992).
 
 
 55
 It is relevant whether the Center had knowledge that the billing model that it adopted in 1992 had come under scrutiny. The district court abused its discretion by allowing the prosecutor's question without requiring the prosecutor to develop a foundation for the question. However, this error was harmless. The objection was to a few sentences in a trial that lasted a week and spans nearly 1000 pages of testimony. See United States v. Gering, 716 F.2d 615, 621 (9th Cir.1983). Improper prosecutorial remarks alone do not justify reversal in an otherwise fair proceeding. Hill, 953 F.2d at 460.
 
 VIII. JURY INSTRUCTIONS
 
 56
 Over appellants' objections, the district court gave the jury a Jewell or "deliberate ignorance" instruction. See United States v. Jewell, 532 F.2d 697 (9th Cir.) (en banc), cert. denied 426 U.S. 951, 96 S.Ct. 3173, 49 L.Ed.2d 1188 (1976). This instruction allowed the jury to find appellants guilty if it determined that appellants had actual knowledge that they were committing Medicare fraud, or if it determined that appellants adopted an attitude of willful blindness toward the CRNA billing regulations and kept themselves deliberately ignorant of the billing regulations.
 
 
 57
 Whether a jury instruction misstated the elements of a statutory crime is a question of law reviewed de novo. United States v. Sanchez-Robles, 927 F.2d 1070, 1073 (9th Cir.1991) (citations omitted).
 
 
 58
 A deliberate ignorance instruction is appropriate only where there is evidence that the defendant may have purposely avoided learning the facts or shut his eyes to avoid learning the existence of a fact he all but knew. United States v. Mapelli, 971 F.2d 284, 286 (9th Cir.1992). A deliberate ignorance instruction is inappropriate where the only evidence alerting the defendant to the high probability of criminal activity is direct evidence of the illegality itself. Sanchez-Robles, 927 F.2d at 1074; Mapelli, 971 F.2d at 287.[7]
 
 
 59
 In this case a Jewell instruction was proper. Appellants' defense was lack of knowledge or intent and mistake. Appellants claim both that they were not aware of the correct way to bill Medicare for CRNA services, and that they attempted to but were unable to decipher the correct billing methods. There is evidence to support a deliberate ignorance theory. Appellants may have lacked actual knowledge that their billing practices were illegal, but had reason to believe that their practices may have been illegal and deliberately failed to investigate proper billing practices. Therefore, appellants' challenge to the jury instructions is rejected.
 
 IX. CUMULATIVE EFFECT OF ERRORS
 
 60
 The district court erred by failing to instruct the jury that the testimony of Ms. Ernst, Ms. Murphy and Ms. Duke (the bad acts witnesses) went only to Dr. Erickson and not to the Center. The district court also erred by allowing the prosecutor to ask a question of Jeryl Robinson without developing a proper foundation for that question. These errors are harmless both singly and in combination. It is unlikely that the combination of these errors materially swayed the jury's verdict. See Hill, 953 F.2d at 458.
 
 X. SENTENCING
 
 61
 The district court considered the evidence relevant to Counts I and II in sentencing appellants. The Guideline range was 21 to 27 months imprisonment. The district court departed downward and sentenced Erickson to two months confinement, four months home detention and three years of supervised release, and the Center to three years probation. The government asked the court to consider conduct under the first two counts, but only if it would lead to a harsher sentence. The district court briefly stated its reasons for departing downward: "[U]nder the totality of what's going to happen here and what has happened and almost certain to happen in the future, I think that's adequate."
 
 
 62
 Review of departures from the Sentencing Guidelines is made under the three-part test established in United States v. Lira-Barraza, 941 F.2d 745, 746-47 (9th Cir.1991) (en banc). First, the reviewing court must determine whether the trial court had the legal authority to depart. The district court here had the legal authority to depart downward pursuant to U.S.S.G. § 2F1.1 (1992). Next, the appellate court reviews for clear error the factual findings in support of the mitigating circumstance identified by the district court as a basis for departure. In this case, it is difficult to review the district court's findings for clear error, since the district court did not specifically state the factual findings on which it relied.
 
 
 63
 Finally, the reasonableness of the extent of the district court's departure is reviewed "in light of the structure, standards and policies of the Act and the Guidelines." Id. at 746-47. The district court must explain the reasoning for both the direction and degree of its departure in sufficiently specific language to allow meaningful review. 18 U.S.C. § 3553(c)(2); Lira-Barraza, 941 F.2d at 751. In the present case, the district court failed to expressly adopt the presentence report or to explain the reasoning for its downward departure. The district court made only a vague general statement regarding the possible retrial of Counts I and II and related civil suits that could be brought. Even the parties at the sentencing hearing were confused as to whether the court had departed downward and what conduct it had considered. We therefore remand the case to the district court for more specific findings as to appellants' sentences. United States v. Carlisle, 907 F.2d 94, 96 (9th Cir.1990) (per curiam).
 
 
 64
 Appellants' convictions are AFFIRMED. Their sentences are REMANDED to the district court for specific findings regarding the offense level and the downward departure.
 
 
 
 [1]
 Count II covered the period January 1990 through July 1992, and Count III covered the period from July 1992 through June 1993, after appellants were informed that they were under investigation for fraudulent billing practices
 
 
 [2]
 The authors of the article testified that they did not feel that there was confusion in the industry, and felt that any existing confusion may have been self-generated
 
 
 [3]
 A related regulation uses a lower standard than "continuous actual presence" to describe physician attendance at concurrent procedures. This regulation allows a physician to direct no more than four concurrent procedures if he is "physically present and available" during all procedures. 42 C.F.R. § 405.552(a)(1)(vi) (1990). The physician may bill for his services during each procedure at a reduced rate set by the regulation. 42 C.F.R. § 414.46(d) (1993). This different standard supports the view that "continuous actual presence" requires more than mere physical availability
 
 
 [4]
 The government argues that appellants waived their objection by objecting to the government's request for a new panel. Though there may be some merit to this argument, we need not address the issue because appellants' original objection was without merit
 
 
 [5]
 Ms. Ernst and Ms. Murphy worked as bookkeepers for Dr. Amicucci in 1984 and 1985. Ms. Ernst testified that when Dr. Amicucci left on sabbatical, Dr. Erickson asked her how Medicare paid on different procedures and how they would pay better. She testified that he fragmented each procedure into parts for billing purposes. Ms. Murphy testified that Dr. Erickson once told her that rather than charging for a complete exam, she should bill for the parts of the exam because they were reimbursed at a higher rate. Ms. Duke, an ophthalmological assistant for Dr. Amicucci and Dr. Erickson in 1984 and 1985, testified that Dr. Erickson fragmented his billing. Each witness admitted on cross-examination that these bills did not cover anesthesia and predated the existence of the Center
 
 
 [6]
 Appellants' reliance on United States v. Ell, 718 F.2d 291 (9th Cir.1983), is misplaced. This case addresses the district court's refusal to exclude witnesses from the courtroom after their initial testimony upon defendant's request pursuant to Fed.R.Evid. 615. Ell does not govern cases such as the case at bar in which a witness violates the court's exclusionary order, or a party fails to request a general exclusionary order. Id. at 293
 
 
 [7]
 An improperly given Jewell instruction requires reversal unless the reviewing court determines that it was harmless beyond any reasonable doubt. Sanchez-Robles, 927 F.2d at 1075; Mapelli, 971 F.2d at 287. The instruction does not call for reversal where the evidence of actual knowledge is "so overwhelming as to compel a guilty verdict." Sanchez-Robles, 927 F.2d at 1075. The reviewing court cannot substitute its judgment for that of the trier of fact. Id