RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 07a0215p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee,*

    *v.*

RICHARD B. WHITE; MICHAEL A. SUHADOLNIK,

        *Defendants-Appellants.*

Nos. 05-3403/3442;
06-3239/3240

>

Appeal from the United States District Court
for the Northern District of Ohio at Youngstown.
No. 03-00001—Patricia A. Gaughan, District Judge.

Argued: January 31, 2007

Decided and Filed: June 11, 2007

Before: NORRIS, COLE, and CLAY, Circuit Judges.

---

## COUNSEL

**ARGUED:** Jon A. Van Steenis, DAIGLE, FISSE & KESSENICH, Madisonville, Louisiana, Amy B. Cleary, FEDERAL PUBLIC DEFENDER'S OFFICE, Cleveland, Ohio, for Appellants. James C. Lynch, ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellee. **ON BRIEF:** Jon A. Van Steenis, DAIGLE, FISSE & KESSENICH, Madisonville, Louisiana, Amy B. Cleary, FEDERAL PUBLIC DEFENDER'S OFFICE, Cleveland, Ohio, Jaime P. Serrat, Cleveland, Ohio, for Appellants. James C. Lynch, ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellee.

CLAY, J., delivered the opinion of the court, in which COLE, J., joined. NORRIS, J. (p. 30), delivered a separate opinion concurring in part and dissenting in part.

---

## OPINION

---

CLAY, Circuit Judge. Defendant Richard B. White appeals his conviction for fourteen separate criminal counts, his sentence of 90-months imprisonment, $7,290,202 in restitution, and two years of supervised release, as well as the district court's order denying his motion for new trial. Defendant Michael A. Suhadolnik appeals his related conviction for one count of wire fraud, as well as the district court's order denying his motion for new trial. For the reasons that follow, we **AFFIRM** Defendants' convictions; **VACATE** the district court's order denying Defendants'

1

motions for new trial and **REMAND** for an evidentiary hearing; and **VACATE** Defendant White's sentence and **REMAND** for resentencing.

## BACKGROUND

### A.    The Medicare Program

This case arises from a complex scheme to defraud Medicare by violating the Medicare "related party" rule. Accordingly, we repeat below a helpful overview of the Medicare program to set the scene before exploring the procedural and substantive facts of this case.[1]

The Medicare program is codified in Title XVIII of the Social Security Act, 42 U.S.C. § 1395 et seq., which establishes a federally-funded health insurance program for the elderly and disabled. The United States Department of Health and Human Services ("HHS") runs Medicare. HHS has delegated the operation of Medicare to its component entity, the Health Care Financing Administration ("HCFA") [recently renamed the Centers for Medicare and Medicaid Services ("CMS")].

HCFA contracts with experienced insurance carriers in various regions of the country to act for HHS in reviewing, processing, and paying Medicare claims. These insurance carriers are called Fiscal Intermediaries ("FI"). Thus, the Fiscal Intermediary acts as the agent of HHS for purposes of auditing claims for reimbursement and administering payments.

Medicare is divided into two parts, Medicare Part A and Medicare Part B. Part A of the Medicare statute authorizes direct payment for covered hospital services to a hospital or other providers of health services. In essence, a provider of services does not bill eligible patients under Medicare for covered services. Rather, the provider is reimbursed by the government for its reasonable costs in providing services (or the customary charges for those services if the customary charges are lower). Medicare Part B is primarily medical insurance which helps pay for doctors and outpatient services.

Providers under Medicare Part A may include: hospitals providing hospital services; home health agencies providing skilled nursing services to "home-bound" patients; and community mental health centers providing psychiatric services under the Medicare Partial Hospitalization Program. All Medicare providers must execute a written agreement with HCFA agreeing to comply with all Medicare laws and regulations.

Once certified as a Medicare provider, such provider may make claims for reimbursement of its costs of operation in providing necessary services. Providers may receive payments on such claims based upon a pre-determined percentage of costs associated with the provider's costs. Claims may be based upon a daily rate of costs per patient or an hourly rate of costs per patient. New providers submit estimates of future costs, and thereafter, the cost report filed by the providers is used to estimate future costs. Medicare reimbursement payments are made on a continuing basis throughout the year based upon claims filed by the provider and are called "interim payments." Annually, the provider must file a Provider Cost Report

---

[1]This background on Medicare appears in the government's brief on appeal, and was contained in the preliminary and final jury instructions at trial without objection.

with the Fiscal Intermediary to permit the Intermediary to audit the claimed costs and determine whether the costs claimed are proper. Once adjustments are made, the FI determines whether the provider has been overpaid or underpaid for the costs allowable for the year.

Pursuant to its statutory authority, the Secretary of HHS has promulgated regulations, codified at 42 C.F.R. § 413, governing the reimbursement of health care providers for reasonable costs. In addition, the Secretary has published interpretations of the governing statute and regulations in the Provider Reimbursement Manual in order to assist these providers as well as the Fiscal Intermediaries in understanding how the government applies this regulatory framework.

The Medicare reimbursement program is structured around the concept of allowable "reasonable costs." "Reasonable costs" are the costs actually incurred by the provider, and excludes any costs found to be unnecessary in the efficient delivery of needed health services. 42 U.S.C. § 1395x(v)(1)(A). Providers are expected by Medicare regulations to minimize costs and not pay any more than what a "prudent buyer" would pay for goods or services.

To prevent unnecessary costs from being claimed, when goods or services are purchased from a party related to the provider, Medicare regulations only permit reimbursement to a provider of the actual costs incurred by that "related party." Thus, a "related party" cannot make a profit from a transaction with a Medicare provider. A "related party" is defined as including a situation where the provider, to a significant extent, has control or is controlled by the organization furnishing the services, facilities, or supplies. Control exists if an individual or an organization has the power, directly or indirectly, to significantly influence or direct the actions or policies of an organization. 42 C.F.R. § 413.17.

Providers are required to identify any costs attributable to a "related party" on the annual Cost Report and elsewhere to permit the Fiscal Intermediary to determine whether there are any "related party" costs which might be adjusted. 42 C.F.R. § 413.20. In addition, with the filing of the cost report, an officer or administrator of the provider must give written responses to a questionnaire that asks, among other things, whether the provider or the management personnel are associated with related organizations and, if so, to identify such related organizations.

(Pl.'s Br. at 14-17)

## B.    Procedural Facts

Defendants Richard B. White ("Defendant White" or "White") and Michael A. Suhadolnik ("Defendant Suhadolnik" or "Suhadolnik"), along with other defendants not involved in this appeal,[2] were indicted on January 8, 2003 on fourteen charges, including (1) Conspiracy to Commit Medicare Fraud (Count 1), (2) Scheme to Defraud the Medicare Program (Counts 2 through 4), (3) Use of a False Document (Count 5), (4) Money Laundering Conspiracy (Count 6), (5) Money Laundering (Counts 7 through 13), and (6) Wire Fraud (Count 14).

---

[2] Charges against defendants Patricia Macejko, Maryann Barnett, and Raul Sanchez DeVarona were separately and variously disposed of without trial.

Prior to trial, Defendants requested a list of the expert witnesses the government planned to call, along with a description of their opinions and the bases therefor. The government responded three weeks after the deadline with a list of intended witnesses and one potential witness, but no information about the opinions to be rendered. Defendants then brought motions *in limine* to exclude the expert testimony alleging the government had failed to comply with Federal Rule of Criminal Procedure 16's notice requirements. The district court ruled off the record and permitted the government to call the identified individuals at trial. In doing so, the district court stated that the witnesses "weren't experts per se, [but] they were people who worked in the [Medicare] industry," as well as fact witnesses. (J.A. at 909)

A jury trial of the charges against Defendants White and Suhadolnik commenced on March 15, 2004. During the trial, the government put forth the testimony of witnesses who discussed their understanding of concepts contained in the Medicare statutes and regulations as they pertained to the case. The government called Luz Reyes ("Reyes"), an audit reimbursement supervisor for one of Medicare's fiscal intermediaries.[3] Reyes testified to her understanding of various terms used in the Medicare Provider Reimbursement Manual ("PRM"), including "cost-related organization," "related," and "control." (J.A. at 1194-97) The government additionally called several other Medicare auditors who had worked on cost reports for Defendant-affiliated companies to testify to their understanding of Medicare concepts, including Cynthia MacDonald, Stephen Shields and David Eve. The defense called a Certified Fraud Examiner, Eva Jo Sparks ("Sparks"), at trial. Sparks had reviewed the government's documents and testified that the Medicare auditors reviewing the case against Defendant White's company, Montrose Management ("Montrose"), did not make a determination that Montrose was a "related party" under Medicare. Sparks further put forth her conclusion that Montrose, in fact, was not a "related party."

On March 30, 2004, the jury found Defendant White guilty on all counts. Subsequently, the district court sentenced White to sixty months imprisonment on Counts 1 and 5, ninety months imprisonment on all other counts (to run concurrently), ordered him to pay $7,290,202 in restitution, and imposed a period of two years supervised release. White timely appealed. On that same day, the jury found Defendant Suhadolnik guilty of wire fraud, and acquitted Defendant Suhadolnik of all other counts against him. Suhadolnik was sentenced to 37 months imprisonment and $10,000 in restitution. Suhadolnik also timely appealed to this Court.

Before their sentencing hearings, however, Defendants learned that Charles Potter ("Potter"), the government's "potential" witness in this case, had received an award for fraud examination and, among his list of "successful cases" had cited the convictions of Defendant White and Raul Sanchez DeVarona ("DeVarona"). Defendants White and Suhadolnik brought a motion to compel Potter to produce any documents he reviewed at the government's request in preparing to testify and to appear for examination. The district court denied the motion, finding Defendants had no "right to discovery of a witness who was not called at trial absent *Brady* material." (J.A. at 40) Defendant White, Sparks, and Defendant Suhadolnik's counsel all separately filed Freedom of Information Act ("FOIA") requests with the Department of Health and Human Services ("HHS") to obtain documents pertaining to the case which were either prepared or received by Potter. They encountered various obstacles to securing the documents and, in the end, received only some small portion of the documents requested. As a result of new evidence, on two occasions, Defendants filed motions for a new trial and a request for an evidentiary hearing. The district court denied these motions both times. Defendants appeal those denials. This Court consolidated White's appeals from

---

[3]As noted above, fiscal intermediaries are insurance carriers that contract with the Center for Medicare and Medicaid Services (CMS) (formerly "HCFA") to review, process, and pay Medicare claims. Among other things, fiscal intermediaries review cost reports filed by Medicare providers to determine the propriety of costs claimed.

his conviction, his sentence, and the denial of his motion for new trial, along with Defendant Suhadolnik's appeals.

### C.     Substantive Facts

Defendant White was extensively involved in healthcare management in the mid-1990s and owned and operated several health-related businesses.  As owner of Reliance Healthcare Management, White operated both nursing homes and community mental health centers.  In so doing, White participated in the "day-to-day hands-on operation" of Medicare providers.  (J.A. at 871-73)  At the same time, White owned Montrose, a financial management and consulting company.  Facing financial troubles in 1995, Youngstown Osteopathic Hospital ("YOH") retained Montrose, which agreed to provide management services to YOH in early 1996 and, in exchange, received a monthly fee of $25,000 and an additional $5,000 for expenses.  In addition, YOH hired new leadership, naming John Weir ("Weir") its new Chief Executive Officer, and Defendant Suhadolnik its new Chief Financial Officer ("CFO").

At some point in 1996, White convened a group of YOH's primary care physicians and proposed the formation of a new company, to be known as HealthSecure, Inc. ("HealthSecure"). Each of the participating physicians contributed $2,000 in start up money and became part owners of the company.  According to Defendant White, the purpose of the venture was to increase patient admissions and services utilized by those patients at YOH, thereby improving the financial stability of the hospital.  The group endeavored to achieve this purpose, White claimed, by establishing subsidiary medical billing and staffing companies.  Ultimately, HealthSecure incorporated subsidiaries including HealthSecure Clinical Staffing, Inc. ("HSCS"), Riverlake Home Health, Inc., Cardio-Pulmonary Management, Inc., National Healthcare Solutions ("NHS"), Pathways of Boynton Beach, Inc. ("PBB"), and HealthSecure of Jackson, Inc.  Defendants White and Suhadolnik took charge of the underlying operations of this venture.  Defendant Suhadolnik was named Secretary-Treasurer of HealthSecure.  In addition to the group's start up funds, White solicited and gained approval of a $750,000 loan from the YOH Board of Directors. Ultimately, HealthSecure borrowed sums far exceeding this figure, totaling close to $2 million.

Also that year, Defendant White proposed the construction of an independent psychiatric unit at YOH.  That facility, known as Pathways Center for Geriatric Psychiatry, Inc. ("Pathways"), was later acquired by Patricia Macejko ("Macejko") and Maryann Barnett ("Barnett"), sisters who were the principals of a nursing home and who also owned community mental health centers in Florida.[4] Macejko and Barnett became owners of Pathways when they executed a promissory note to YOH for between $250,000 and $450,000 – the costs to YOH of developing the center.  Pathways rented space from YOH for its facility.  Although Macejko and Barnett owned Pathways, White – through Montrose – essentially operated and controlled the center.  Under a management agreement between Pathways and Montrose, Montrose received $30,000 per month for its management activities. Additionally, Montrose received $16,500 per month to provide billing services.  Pathways contracted with NHS, a second healthcare consulting business then owned as a sole proprietorship by Richard Feldman ("Feldman"), for management of its clinical operations.  Pathways also had a contract with NHS, under which it payed $55,000 per month for its day-to-day operation of the center.  According to Feldman's testimony, Defendant White later "took over" operations of NHS and incorporated the company, leaving Feldman in place as nominal head.  Defendant Suhadolnik became CFO of NHS.

---

[4]Defendant White, through Montrose, additionally provided management services to Macejko and Barnett's nursing home, Ashley Place.

In connection with the day-to-day operations of Pathways, Feldman prepared an application for certification as a Medicare provider and, therein, indicated that Pathways had no transactions with any related organizations. Feldman did not understand at the time what "related transactions" meant and marked "no" only after asking White. When asked, White expressly indicated there were no "related transactions." Pathways became a certified Medicare provider in 1997. As a Medicare provider, Pathways submitted the management fees charged by both Montrose and NHS for reimbursement, and Montrose itself prepared the cost reports submitted. Those cost reports specifically disclaimed the inclusion of any related organization costs.

Also in early 1996, DeVarona contacted Defendant White to obtain financial management services from one of White's companies for Douglas Mental Health Center ("Douglas") in Florida. Together, White and DeVarona subsequently became involved with additional Medicare providers via third party service and management agreements. According to DeVarona's testimony at trial, he attended a September 1996 meeting called by Defendant White wherein White proposed that a network of Medicare facilities be created which he would control, and stated that the owners of those facilities would enter into agreements at rates he established (along with DeVarona). DeVarona further testified that HSCS, which later provided staffing to Medicare providers controlled by Defendant White and DeVarona, charged providers a 300 percent mark up.

In May or June of 1997, Defendant White also engineered the sale of two Medicare-certified community mental health care facilities in Florida to Macejko and Barnett. The genesis of these deals was a meeting between White, Suhadolnik, Feldman, and DeVarona, among others. At that meeting, White proposed that those community mental health facilities – New Hope and Douglas – enter into third-party service agreements and management contracts with several companies, including Montrose, HSCS, Behavior Solutions, and NHS. Macejko and Barnett agreed to pay $200,000 over a period of five years for New Hope and Douglas. Those facilities subsequently contracted with HSCS, Montrose, and two of DeVarona's companies – Behavioral Billing and Behavioral Solutions – for various third-party services and management services. Douglas and New Hope, both certified Medicare providers, included the costs of those management and third-party service agreements on their Medicare cost reports. Again, as with Pathways, Montrose prepared those reports for submission. The cost reports submitted from 1996 to 1998 failed to identify the third-party and management service providers as "related parties," as required by the Medicare regulations (42 C.F.R. § 413.17).

Some time in 1996, two separate community mental health centers in Florida – All Professional and Renaissance – sought Medicare certification, but lacked the financial backing to pay their respective staffs in the interim. DeVarona approached White and proposed that HSCS provide clinical staffing for All Professional and Renaissance until they were certified. White agreed to do so, and the two health centers entered into several agreements, including clinical staffing agreements with HSCS, and contracts with Montrose, Behavioral Billings, Behavior Solutions, and NHS. In return, the suppliers agreed to carry receivables due until the health centers were certified by Medicare. In billing the two health centers, the record indicates that HSCS marked up certain nursing and social work services by a factor of 3.2. When All Professional and Renaissance were finally Medicare certified, they submitted the costs associated with these agreements for reimbursement. Those cost reports were also prepared by Montrose, however Larry Belcher ("Belcher"), and not Defendant White, prepared them on that occasion.

At trial, DeVarona testified that the various third-party service providers carried the receivables until All Professional and Renaissance were certified by borrowing funds from Pathways or from YOH (via HealthSecure or HSCS). During this time, Renaissance incurred $2 million in receivables from HSCS, and Pathways became indebted to YOH in the amount of $2.5 million. Evidence adduced at trial shows that Defendant Suhadolnik approved transfers of funds from YOH

to HealthSecure, and from HealthSecure to several other service providers. The government further introduced evidence of a $10,000 wire transfer from HealthSecure to Montrose.

When a member of the Board of Trustees at YOH, Eugene Fox ("Fox"), reviewed the hospital's financial statements, he grew concerned and approached Defendant Suhadolnik. Suhadolnik informed Fox that Pathways had been loaning its Medicare revenue to HealthSecure instead of satisfying its obligations to YOH, and that HealthSecure in turn was loaning funds to the two health centers in Florida. Later that evening, Fox further explored the situation by questioning Defendant White at the monthly Board of Trustees meeting. Ultimately, YOH terminated its agreement with Montrose and severed ties with White. Macejko and Barnett also ended their agreement with Montrose. The government introduced evidence at trial that Medicare reimbursed over $14 million in 1997 and 1998 to providers controlled by Defendant White and DeVarona.

## DISCUSSION

### I.    SUFFICIENCY OF THE EVIDENCE

#### A.     Standard of Review

We review sufficiency of the evidence claims to determine whether "any rational trier of fact could find the elements of the crime beyond a reasonable doubt" and, in doing so, we "view[] the evidence in the light most favorable to the prosecution, . . . giving the government the benefit of all inferences that could reasonably be drawn from the testimony." *United States v. M/G Transp. Servs., Inc.*, 173 F.3d 584, 589 (6th Cir. 1999) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "A defendant claiming insufficiency of the evidence bears a very heavy burden." *United States v. Vannerson*, 786 F.2d 221, 225 (6th Cir.1986) (quoting *United States v. Soto*, 716 F.2d 989, 991 (2d Cir. 1983)) (internal quotation marks omitted).

#### B.     Sufficient Evidence Supports Defendant White's Conviction

Defendant White raises a sufficiency of the evidence challenge to his conviction on Counts 1 - 5 (Conspiracy to Commit Medicare Fraud (Count 1), Scheme to Defraud the Medicare Program (Counts 2 through 4), and Use of a False Document (Count 5)).[5] White insists that his convictions cannot be sustained because nothing in the record suggests that his "interpretation of the related-party regulation . . . was incorrect, much less 'knowingly and willfully' false or fraudulent," and accordingly, the evidence was insufficient to show he possessed "the requisite fraudulent intent . . . to accomplish the substantive crimes at issue." (Def. White's Br. at 44-45) Additionally, Defendant White challenges his conviction for money laundering and money laundering conspiracy (Counts 6 through 13). Viewing the evidence in the light most favorable to the prosecution, we find that a rational trier of fact could find the essential elements of each of the offenses underlying Defendant White's conviction beyond a reasonable doubt.

##### 1.     *Scheme to Defraud Medicare (18 U.S.C. § 1347)*

A rational finder of fact could conclude beyond a reasonable doubt that Defendant White engaged in a scheme to defraud Medicare. Title 18 U.S.C. § 1347 criminalizes Medicare fraud and, by its terms, provides that:

---

[5]Defendant White first argues that, as a matter of statutory and regulatory interpretation, his management companies and the Medicare providers were not "related parties;" and, in the alternative, White advances the sufficiency of the evidence argument. In view of the evidence presented at trial that, in fact, White knew and believed the management companies and providers to be related parties, this argument strikes this Court as particularly disingenuous.

> Whoever knowingly and willfully executes, or attempts to execute, a scheme or artiface –
>
>> (1) to defraud any health care benefit program; or
>>
>> (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program,
>
> in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both.

18 U.S.C. § 1347. To sustain a Medicare fraud conviction under § 1347, the government must prove that the defendant "(1) knowingly devised a scheme or artifice to defraud [Medicare] in connection with the delivery of or payment for [Medicare] benefits, items, or services; (2) executed or attempted to execute this scheme or artifice to defraud; and (3) acted with intent to defraud." *United States v. Raithatha*, 385 F.3d 1013, 1021 (6th Cir. 2004), *judgment vacated on other grounds*, 543 U.S. 1136 (2005). Thus, the government must prove the defendant's "specific intent to deceive or defraud." *United States v. Frost*, 125 F.3d 346, 354 (6th Cir. 1997).

On appeal, Defendant White primarily argues he did not have the requisite intent because he apparently did not know the transactions were "related party" transactions under the Medicare statute and regulations. At the outset, it should be noted that "the question of intent is generally considered to be one of fact to be resolved by the trier of the facts . . . and the determination thereof should not be lightly overturned." *United States v. Wagner*, 382 F.3d 598, 612 (6th Cir. 2004) (quoting *United States v. Daniel*, 329 F.3d 480, 487 (6th Cir. 2003)). Moreover, testimony adduced at trial supports more than a reasonable inference that Defendant White intended to defraud Medicare. Specifically, DeVarona's trial testimony substantially supports such a view:[6]

> Q.     . . . [C]an you please outline in very brief terms what exactly you did to make yourself guilty of [conspiracy to defraud Medicare]?
>
> . . .
>
> A.     We – – I, participated in a scheme designed by [Defendant] White to submit inflated contracts to Medicare so the Medicare dollars would flow to our companies.
>
> Q.     And how was that accomplished . . . ?
>
> A.     By submitting inflated contracts amongst related parties to Medicare and not disclosing the fact that these companies were related parties.
>
> Q.     And you said they were related parties. How were they related?
>
> A.     Because Mr. White and ourselves controlled these Medicare providers even though we were not the officers nor directors of these companies.
>
> Q.      Were any of the other defendants involved in this?

---

[6]DeVarona himself pled guilty and, thus, did not stand trial.

> A.      . . . Barnett and . . . Macejko were the nominee [sic] owners of the Medicare licensed facilities, and [Defendant] Suhadolnik was the person in charge of the finances for all the operations here in Ohio to get the money to the companies.
>
> . . .
>
> [Barnett and Macejko] were placed in an ownership position so that they could sign off on documents that would tell Medicare that these were independent facilities, where in reality they weren't. They were placed there and served at the direction of Mr. White.

(J.A. at 924-25)  A reasonable jury could certainly have taken DeVarona's testimony to establish White's intent and knowledge that the Medicare "related party" rule applied to the transactions between companies they controlled.

Feldman's testimony on the development of Pathways and the Pathways–YOH transactions provides additional support for such a finding.  He stated that White had asked Barnett and Macejko to become owners of Pathways "because they would do whatever he asked them to do, and they would be in a sense absentee landlords." (J.A. at 1051)  Additionally, Feldman testified that White had set the terms of an agreement for NHS to provide day-to-day management services to Pathways, with Barnett, Macejko, and himself – as nominal President of NHS – merely signing off.  The evidence further supports a finding of intent to defraud Medicare by concealing "related party" status.  Defendant White accomplished this both by failing to disclose the status on cost reports submitted to Medicare, many of which White directly controlled, and by essentially recruiting sham owners for facilities certified as Medicare providers, which later contracted with third-party service and management providers also under his control.

Viewing the evidence in the light most favorable to the prosecution, a reasonable jury could find Defendant White knowingly and willfully devised this scheme.  White had developed a reputation as a "Medicare guru" over years of extensive involvement in health care services and with Medicare providers.  He spearheaded the formation of HealthSecure and its various subsidiary medical billing and staffing companies.  White proposed the Pathways facility, later acquired by Macejko and Barnett, and then entered into a management agreement (via Montrose) with Pathways.  Most directly on point, DeVarona testified about a meeting White called in September 1996 at which he proposed the creation of a network of Medicare facilities.  These facilities, according to White's proposal, would be owned by third parties but controlled by him,  would enter into agreements with third party medical service providers also under his control, and would pay those facilities at significantly inflated rates.  The trial record additionally shows that White executed this scheme by actually entering into the transactions, and submitting and receiving reimbursement for management fees billed to the Medicare providers he controlled.

### 2.      *Conspiracy to Commit Medicare Fraud (18 U.S.C. § 371)*

A reasonable trier of fact could also find beyond a reasonable doubt that Defendant White conspired to commit Medicare fraud.  Title 18 U.S.C. § 371 proscribes conspiracy to defraud the federal government.  To prove conspiracy to defraud, the government must show "(1) an agreement to accomplish an illegal objective against the United States; (2) one or more overt acts in furtherance of the illegal purpose; and (3) the intent to commit the substantive offense, i.e., to defraud the United States." *United States v. Douglas*, 398 F.3d 407, 413 (6th Cir. 2005).  The agreement need not be explicit; rather, a "tacit or mutual understanding among the parties will suffice." *United States v. Ellzey*, 874 F.2d 324, 328 (6th Cir. 1989) (citing *United States v. Bavers*, 787 F.2d 1022, 1026 (6th Cir.1985)).  Further, conspiracy to defraud may be proven by circumstantial evidence that

reasonably supports an inference of participation in some common plan. *Ellzey*, 874 F.2d at 328; *see also United States v. Suba*, 132 F.3d 662, 672 (11th Cir. 1998).

First, DeVarona's testimony, which we reviewed at length in the preceding discussion, establishes an explicit agreement to criminally defraud the Medicare program. Yet, even if not taken as an express agreement, a reasonable jury could find that the testimony of DeVarona and of Feldman demonstrates the type of "tacit or mutual understanding among the parties" required to establish an implicit conspiracy to defraud. *See Ellzey*, 874 F.2d at 328.

Second, on the evidence adduced at trial, Defendant White plainly committed overt acts in furtherance of his scheme to defraud Medicare. This is evidenced by Defendant White's prominent role in several of the companies involved, including HealthSecure, Montrose, Pathways, and NHS; a financial services agreement between Montrose and Pathways, executed by White and Barnett, whereby Montrose contracted to provide billing and management services in exchange for fees totaling $46,500 a month; Feldman's testimony that Defendant White directed him to sign an agreement on behalf of NHS to provide oversight services to Pathways at a fee of $55,000 per month; additional testimony that Defendant White later took control of operations at NHS and installed Defendant Suhadolnik as CFO of the company; and Medicare cost reports submitted on Pathways' behalf including management fees charged by Montrose and NHS alike, expressly indicating those parties were not "related" under the "related party" rule.

Third, we have already determined that a reasonable jury could find Defendant White intended to defraud the Medicare program and need not revisit that point here. Of course, an exhaustive recitation of the evidence is neither necessary nor desirable here. Suffice it to say the government put forth a substantial body of evidence, we have reviewed it, and, viewing that evidence in the light most favorable to the government, it amply supports Defendant White's conviction for conspiracy to commit Medicare fraud.

### 3. *Use of a False Document (18 U.S.C. § 1001(a)(3))*

Sufficient evidence also supports Defendant White's conviction for use of a false document. Title 18 U.S.C. § 1001(a)(3) prohibits knowingly and willfully "mak[ing] or us[ing] any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry." 18 U.S.C. § 1001(a)(3). Here, the government must prove "(1) the defendant made a statement; (2) the statement is false or fraudulent; (3) the statement is material; (4) the defendant made the statement knowingly and willfully; and (5) the statement pertained to an activity within the jurisdiction of a federal agency." *Raithatha*, 385 F.3d at 1022. Thus, the government must prove that the defendant knew the statement was false or fraudulent. 18 U.S.C. § 1001(a)(3); *United States v. Brown*, 151 F.3d 476, 486 (6th Cir. 1998).

The 1998 Medicare cost report submitted on behalf of Pathways contained the false statement that Pathways had no "related party" costs. Belcher had prepared the cost report at White's direction and, in so doing – as he testified at trial – had approached White about the "related party" question. Belcher expressed his concern that Montrose and Pathways were related parties and that, accordingly, "the full management fee should not be included in the cost report." (J.A. at 851) Belcher testified that Defendant White responded by directing him to include the full charge in the report. In view of the foregoing, we find that Defendant White has failed to sustain his "heavy burden" on this issue, and that there was sufficient evidence at trial to support his convictions for Medicare fraud, conspiracy to commit Medicare fraud, and use of a false document.

### 4. *Money Laundering and Conspiracy (18 U.S.C. §§ 1956, 1957)*

Finally, we find that, viewing the evidence in the light most favorable to the prosecution, sufficient evidence supports Defendant White's conviction for money laundering. Here, Defendant

White argues that the payments were used not in furtherance of unlawful activity but to pay legitimate business expenses, and that there was no unlawful activity (Medicare fraud). White further asserts that § 1957(a) requires the acts of money laundering to be distinct from the unlawful activity and that the transactions challenged here would be part of a purported scheme to defraud Medicare, and thus not distinct.

Title 18 U.S.C. § 1956(a)(1)(A)(i) makes it a violation to knowingly "conduct[] or attempt[] to conduct . . . a financial transaction which in fact involves the proceeds of specified unlawful activity . . . (A)(i) with the intent to promote the carrying on of specified unlawful activity." To prove money laundering under this Section, the government must show that Defendant "(1) conducted a financial transaction that involved the proceeds of unlawful activity; (2) knew the property involved was proceeds of unlawful activity; and (3) intended to promote that unlawful activity." *United States v. McGahee*, 257 F.3d 520, 526 (6th Cir. 2001) (citing *United States v. King*, 169 F.3d 1035, 1039 (6th Cir.1999)). Similarly, 18 U.S.C. § 1957(a) makes it a crime for parties to "knowingly engage[] or attempt[] to engage in a monetary transaction in criminally derived property of a value greater than $10,000 [which] is derived from specified unlawful activity." 18 U.S.C. § 1957(a). The government must demonstrate that the Defendant (1) engaged in a financial transaction involving the proceeds of unlawful activity; (2) knew the proceeds derived from unlawful activity; and (3) the proceeds exceeded $10,000 in value. *Id.*

Finally, 18 U.S.C. § 1956(h) separately proscribes conspiracy to commit money laundering under 18 U.S.C. §§ 1956 and 1957. The elements of conspiracy to commit money laundering include (1) an agreement or understanding entered into by two or more persons to commit money laundering, (2) the performance of an overt act in furtherance of the agreement, and (3) Defendant's knowing and deliberate participation in the conspiracy. *United States v. Conley*, 37 F.3d 970, 976-77 (3d Cir. 1994) (citing *United States v. Rankin*, 870 F.2d 109, 113 (3d Cir.1989)).

Viewing the evidence in the light most favorable to the prosecution, a reasonable jury could convict Defendant White of the offense of money laundering under both §§ 1956 and 1957, and conspiracy to commit money laundering. DeVarona testified at trial that NHS and later HSCS billed Douglas at inflated rates for staffing services. Douglas would then submit those costs to Medicare for reimbursement and would pay NHS or HSCS their inflated staff charges. Evidence of one such payment was introduced at trial, and the transfer was in the amount of $62,477. Subsequently, as DeVarona testified, Defendant White engineered agreements with two Florida community mental health centers: All Professional and Renaissance. With respect to each, Defendant agreed to provide staffing to the facilities and to hold their bills until they became Medicare certified, in exchange for the facilities agreeing to use HSCS, NHS and Montrose as their third-party service and management service providers. Defendant White set the rates for the services. The record indicates that White marked up certain of HSCS' nursing and social work services by a factor of 3.2. Further, DeVarona testified that the various third-party service providers carried the receivables until All Professional and Renaissance were certified by borrowing funds from Pathways or from YOH (via HealthSecure or HSCS).

Defendant White argues that Sparks's testimony at trial shows that Montrose used the funds to pay legitimate business expenses, not to further unlawful activity. During cross-examination, however, Sparks admitted that although the Montrose payroll records revealed "a draw of money[]" to Defendant White's wife, as well as loans to both Defendant White and Mrs. White, she did not audit those loans and advances. (J.A. at 1328-29) At any rate, Sparks' testimony does not necessarily defeat the overwhelming evidence introduced at trial to show proceeds from unlawful activity being filtered back into funding further unlawful activity. Further, Defendant White argues the transactions were part of the criminal offense of defrauding Medicare and "not subsequent laundering of those proceeds." (Def. White's Br. at 75) This argument lacks merit inasmuch as the criminal offense of defrauding Medicare occurred when Defendant knowingly engaged in related

party transactions billing for services at an inflated rate. The offense of money laundering, however, as discussed above, occurred when Defendant directed the transfer of fraudulently obtained funds to organizations which subsequently engaged in further fraud – charging Medicare inflated rates for payment to an undisclosed related party.[7] Consequently, sufficient evidence supports Defendant White's conviction on Counts 6 through 13 of the indictment for the money laundering and money laundering conspiracy.

## II.     THE GOVERNMENT'S WITNESS TESTIMONY

### A.     Standard of Review

We review for abuse of discretion a district court's evidentiary rulings, including rulings on witness testimony under Rules 701 and 702 of the Federal Rules of Evidence. *JGR, Inc. v. Thomasville Furniture Indus., Inc.*, 370 F.3d 519, 524 (6th Cir. 2004); *see also United States v. Bartholomew*, 310 F.3d 912, 920 (6th Cir. 2002). We reverse only where the district court's erroneous admission of evidence affects a substantial right of the party. Fed. R. Evid. 103(a); *see also United States v. Whittington*, 455 F.3d 736, 738 (6th Cir. 2006) (citation omitted). Additionally, we review the district court's rulings on issues raised under Federal Rule of Criminal Procedure 16(a)(1)(G) – if any – for abuse of discretion. *United States v. Harris*, Nos. 04-3996, 04-3997, 04-4030, 2006 WL 2873398 (6th Cir. Oct. 10, 2006) (unpublished).

### B.     Witness Testimony Did Not Affect Defendants' Substantial Rights

Defendant White assigns error on three bases: first, that the district court improperly denied White's motion *in limine* to exclude the testimony of several government witnesses; second, that the district court abused its discretion in permitting witnesses with specialized knowledge to proffer lay testimony at trial; and third, that the government failed to provide adequate notice under Federal Rule of Criminal Procedure 16(a)(1)(G). Defendant Suhadolnik advances substantially the same challenge.

Defendants requested "a written summary of any expert testimony which the government intend[ed] to offer in evidence under Rules 702, 703, or 705 [of the] Federal Rules of Evidence . . . , to include a description of the witnesses' opinions, the bases and reasons therefor and the witnesses' qualifications." (J.A. at 102, 115, 117) The government responded – three weeks after the discovery deadline had run – that it expected seven witnesses to testify at trial either as expert or fact witnesses. In its response, the government offered only generalized information about the nature of the expected testimony, along with the witnesses' contact information and one sentence detailing their qualifications. During pretrial proceedings, the district court decided that the witnesses who worked as Medicare auditors "really weren't experts per se, [but rather] that they were people who work in the industry." (J.A. at 909) At trial, the government did not qualify the challenged witnesses as experts, although preliminary questions to the Medicare auditors established their work experience and background.[8] Rather, the district court permitted each challenged witness to testify as lay witnesses pursuant to Federal Rule of Evidence 701.

---

**7**Defendant cites the Second Circuit's opinion in *United States v. McCarthy* in support of this argument. What Defendant fails to state, however, is that *McCarthy* also provides that "when the underlying crime is completed, a transaction conducted with the proceeds from that crime may provide the basis for a money laundering conviction," and further notes, citing Third Circuit law, that "funds became proceeds of fraud when removed from the control of the victims and placed under control of defendants." 271 F.3d 387, 395 (2d Cir. 2001).

**8**On appeal, Defendants specifically cite to testimony put forth by Reyes, Cynthia MacDonald ("MacDonald"), Steven Shields ("Shields"), David Eve ("Eve"), all of whom were Medicare auditors, and to the testimony of DeVarona and Feldman.

At the outset, we hold that DeVarona and Feldman properly testified as lay witnesses. Defendant White's challenge to the admissibility of DeVarona's testimony hinges on DeVarona's statement, "All these contracts contained a significant profit margin which rendered them unreasonable." (Def. White's Br. at 66 (citing J.A. at 985-86))  At a sidebar to discuss defense counsel's objections to this statement, the district judge admonished the government counsel that DeVarona could "testify as to what he believed he did wrong and the co-conspirators," but not "in general what a related party is and were there related parties." (J.A. at 984)  Challenging the admissibility of Feldman's testimony, Defendant White takes issue with Feldman's testimony that White had "control" over certain of the businesses. (Def. White's Br. at 66 (citing J.A. at 1040-41))  Defendants' challenge to the testimony of DeVarona and Feldman, fact witnesses directly involved in the transactions at issue in this case, cannot seriously be sustained.  Moreover, the district judge instructed the prosecutor to avoid questioning that would enter the unauthorized waters of expert testimony.  Accordingly, we find no abuse of discretion inasmuch as the court properly confined DeVarona and Feldman to lay testimony.

We turn now to the closer question – whether the Medicare auditors properly testified as lay witnesses.  Reyes was employed as an audit manager by AdminaStar Federal, the Medicare Fiscal Intermediary responsible for Pathways and Ashley Place (a nursing home formerly owned by Barnett and Macejko).  As the government described in its Rule 16 response, Reyes was "involved with the Medicare interim rate setting and Medicare cost report auditing" for Pathways. (J.A. at 83)  Also in that response, the government indicated that Reyes might be called as a fact witness. Ultimately, Reyes did testify as a fact witness.  She testified about the structure of the Medicare program generally, the work performed by her employer as a Fiscal Intermediary, the process for paying claims, her personal contact with Defendant Suhadolnik, and her work on the Pathways audits.  Reyes reviewed Pathways' cost reports on the record, as well as relevant parts of the Medicare Provider Reimbursement Manual.  At several points during Reyes' testimony, defense counsel objected – specifically, when the government asked Reyes: (1) what "reasonable cost" means; and (2) what constitutes a "related-party transaction."[9] (J.A. at 1182, 1186)  With respect to defense counsel's objection to the question regarding "related-party transactions," the district judge conducted a side-bar on the record.  She requested that the government explain how such a definition would relate to Reyes' duties at AdminiStar.  The prosecutor replied that, as a part of her auditing duties, Reyes "examin[es] th[e] issue, a question of were there related parties involved." (J.A. at 1186)  The district judge then permitted Reyes to testify to "her own understanding of related parties." (J.A. at 1187)

MacDonald was an auditor/supervisor employed by Mutual of Omaha, and worked on audits for the Douglas and New Hope facilities.  At trial, MacDonald testified to the Medicare provider reimbursement process generally, and more specifically, to "[her] understanding of . . . various Medicare concepts," including reasonable costs and related party transactions. (J.A. at 1107-09, 1112)  MacDonald further reviewed New Hope's cost reports in court and discussed related-party searches conducted during the audit process.  Shields likewise worked at Mutual of Omaha as an auditor for the Douglas and New Hope facilities.  Like MacDonald, Shields testified at trial to "[his] understanding . . . of [various Medicare] concepts as [he] experienced them" while working for Mutual of Omaha. (J.A. at 1251)  Shields' testimony included an overview of the Medicare program and the audit process. Additionally, Shields specifically testified to his understanding of the concept related-party transaction and to his role in auditing the Douglas facility's cost reports.  Finally, Eve worked as an auditor at AdminaStar Federal along with Reyes.  At trial, he described the type of work performed by a Fiscal Intermediary, as well as the parameters of his job as an auditor.  Eve

---

[9]Defendant Suhadolnik's brief alleges that Reyes "explained the term 'cost-related organization' . . . by referencing specific portions of the PRM." (Def. Suhadolnik's Br. at 43-44)  In fact, she was reading verbatim from the PRM, an exhibit admitted into evidence, at that point.

testified to his understanding of the Medicare regulations with respect to the basis for reimbursement, the prudent buyer concept, and the term related-party transactions. Eve discussed the initial process for certifying new Medicare providers and the reporting requirements applicable to related-party transactions. Further, he read portions of the Provider Reimbursement Manual applicable to related-party transactions.

We find the district court erred in part in allowing Reyes, MacDonald, Shields, and Eve (collectively, "the Fiscal Intermediary witnesses") to testify as lay witnesses. Rule 701 provides that

> [i]f the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) *not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.*

Fed. R. Evid. 701 (emphasis added). In 2000, the drafters amended Rule 701 to foreclose lay witness testimony "based on scientific, technical, or other specialized knowledge" – testimony more properly given by a qualified expert. In amending the Rule, the drafters intended to preclude a party from surreptitiously circumventing "the reliability requirements set forth in Rule 702 . . . through the simple expedient of proffering an expert in lay witness clothing" and to "ensure[] that a party will not evade the expert witness disclosure requirements set forth in . . . Fed. R. Crim. P. 16 by simply calling an expert witness in the guise of a layperson." Fed. R. Evid. 701 advisory committee's note (2000).

To distinguish lay witness testimony from expert testimony, the Advisory Committee incorporated the Tennessee Supreme Court's treatment of the issue in *State v. Brown*, 836 S.W.2d 530, 549 (Tenn. 1992). Under *Brown*, lay testimony "results from a process of reasoning familiar in everyday life," whereas "an expert's testimony results from a process of reasoning which can be mastered only by specialists in the field." *Brown*, 836 S.W.2d at 549 (citation omitted). Accordingly, a lay witness could testify, for example, that "a footprint in snow looked like someone had slipped, or that a substance appeared to be blood." *Id*. at 550 (internal citations omitted). Yet, lay testimony is improper where it encompasses opinions that "call[] for specialized skill or expertise" – such as a paramedic's testimony that skull trauma caused the bruises on a victim's face. *Id.* at 550. The distinction is far from clear in cases where, as here, a witness with specialized or technical knowledge was also personally involved in the factual underpinnings of the case. *See United States v. Ayala-Pizarro*, 407 F.3d 25, 28 (1st Cir. 2005) (citation omitted) (observing that "[t]he line between expert testimony under Fed. R. Evid. 702 . . . and lay opinion testimony under Fed. R. Evid. 701 . . . is not easy to draw"); *United States v. Cruz*, 363 F.3d 187, 194 (2d Cir. 2004) ("District courts must be especially vigilant in evaluating the admissibility of expert testimony where . . . a [witness] is called on to testify as a fact witness but also functions as an expert."); *United States v. Perkins*, 470 F.3d 150, 155 (4th Cir. 2006) (citations omitted).

Since the effective date of the 2000 amendment, we have had few opportunities to explore this distinction. In *United States v. Ganier*, 468 F.3d 920, 922 (6th Cir. 2006), the government challenged the district court's decision to exclude a government computer specialist's expert testimony at trial for failure to provide adequate notice under Federal Rule of Criminal Procedure 16(a)(1)(G). There, the government argued that the computer specialist would offer "lay testimony available by 'running commercially-available software, obtaining results, and reciting them.'" *Id*. at 925. We rejected this claim, finding that "such an interpretation would require [the witness] to apply knowledge and familiarity with computers and the particular forensic software well beyond that of the average layperson." *Id*. In so doing, we acknowledged our previous decision in *United States v. Wells*, 211 F.3d 988, 997-98 (6th Cir. 2000), wherein we "allowed witnesses to apply specialized knowledge while giving lay testimony." *Id*. at 926-27. Nevertheless, we ultimately

concluded that the computer specialist's testimony fell outside the proper bounds of Rule 701 in light of the 2000 amendment, which went into effect following *Wells*. *Id*. Accordingly, we found that the government violated Federal Rule of Criminal Procedure 16(a)(1)(G). *Id*. at 927.

Our sister circuits have also probed the issue. In *United States v. Cruz*, 363 F.3d 187, 189 (2d Cir. 2004), the Second Circuit held that the district court improperly admitted expert testimony of a Special Agent for the Drug Enforcement Administration (DEA). Because the DEA agent participated in surveillance of the drug operation at issue, the government called him as a fact witness at trial. *Id*. at 193. However, the district court permitted the DEA agent to proceed as though qualified as an expert and to testify to the meaning of the phrase "to watch someone's back" as used in a drug transaction. *Id*. at 191, 193. The DEA agent "relied on his expert opinion to interpret the meaning of the phrase . . . after [the defendant] used those terms to describe his role" in the transaction, effectively drawing conclusions about the defendant's conduct. *Id*. at 194. The *Cruz* court concluded that the district court erred in permitting the DEA agent to offer expert opinions on the meaning of an ambiguous phrase, noting that the government had failed to proffer evidence that the phrase was used as a "drug code." *Id*. at 197. Additionally, the court found that, in any event, the district court "failed to fulfill its gatekeeping functions" by permitting the DEA agent to testify as though an expert when the government had not given notice under Federal Rule of Criminal Procedure 16. *Id*. at 196 n.2.

In *United States v. Garcia*, 413 F.3d 201, 215 (2d Cir. 2005), the Second Circuit explored the 2000 amendment to Rule 701 in some detail. At the outset, the *Garcia* court observed that "a lay opinion must be the product of reasoning processes familiar to the average person in everyday life." *Id*. (citing Fed. R. Evid. 701 advisory committee's notes (2000)). The drafters incorporated the "final foundation requirement . . . to prevent a party from conflating expert and lay opinion testimony thereby conferring an aura of expertise on a witness without satisfying the reliability standard . . . in Rule 702 and the pre-trial disclosure requirements set forth in Fed. R. Crim. P. 16." *Id*. The challenged testimony in *Garcia* was that of a DEA agent who had investigated the defendant's case and who testified at trial as to the defendant's role in the charged conspiracy. *Id*. at 210 (recounting the agent's testimony that "in his opinion, [Defendant] was a 'partner . . . in receiving cocaine from [a supplier]'"). There, the court found the agent's testimony inadmissible under Rule 701 because "his reasoning process was not that of an average person in everyday life; rather, it was that of a law enforcement officer with considerable specialized training and experience in narcotics trafficking." *Id*. at 217.

The Fourth Circuit considered whether police officers properly testified as lay witnesses, having observed the defendant (a fellow officer) kick and injure a motorist who fled from a routine traffic stop, in *United States v. Perkins*, 470 F.3d 150, 151-52, 156 (4th Cir. 2006). The officers testified "in terms of their eyewitness observations and particularized experience" to matters common in nature, which "required . . . a limited amount of expertise." *Id*. at 156 (internal brackets and quotations omitted). Thus, the *Perkins* court held the testimony properly admitted under R. 701. In *United States v. Griffin*, 324 F.3d 330, 347 (5th Cir. 2003), the Fifth Circuit considered claims that the district court erred in permitting the former director of the Texas Department of Housing and Community Affairs (TDHCA) to testify to the applicability of state law. The challenged witness "testified as to her understanding of the state ethics rules and what TDHCA employees were instructed about those rules." *Id*. at 347. The court found that although the witness's testimony met with the requirements of Rule 701, the district court erred in admitting it since it constitutes "[the witness'] own interpretation of the law." *Id*. at 347-48 (citing *Huff v. United States*, 273 F.2d 56, 61 (5th Cir. 1959)).

Finally, in *Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co., Ltd.*, 320 F.3d 1213, 1217-18 (11th Cir. 2003), the defendant shipping company objected to the lay testimony of plaintiff repair company's project manager and superintendent, which characterized plaintiff's repair

charges as reasonable. According to the defendant, "any testimony as to 'industry standards' and reasonableness are necessarily precluded due to Rule 701's 2000 amendment." *Id*. at 1217. The defendant similarly objected to testimony of the plaintiff's subcontractor, cost-estimating consultant, and chief executive officer. *Id*. at 1218-20. The *Cedar Shipping* court reviewed the 2000 amendment to Rule 701, along with the Advisory Committee's note, and concluded that "opinion testimony by business owners and officers is one of the prototypical areas intended to remain undisturbed." *Id*. at 1221-22. The court found that the plaintiff's owners, officers, and employees properly testified under Rule 701 because of their "particularized knowledge" acquired over years working with the business.[10] *Id*. at 1223.

As the precedent clarifies, the Federal Rules of Evidence distinguish between lay and expert *testimony*, not *witnesses*. *See* Fed. R. Evid. 701; *id*. at advisory committee's notes (2000); Fed. R. Evid. 702. One witness may properly offer lay testimony and, at the same time, may be precluded from putting forth expert testimony. Defendants do not argue – nor could they – that the district court should have entirely precluded each of the challenged witnesses from testifying. Each challenged witness had personal knowledge of facts relevant to the case – whether from their role auditing cost reports submitted by Defendants, or from their personal interactions with Defendants. Much of their testimony fits squarely within the proper bounds of Rule 701 and we do not discuss at length the propriety of that portion of the witness testimony.

Nonetheless, the district court erred when it allowed the Fiscal Intermediary witnesses to testify without being qualified as experts. Often times, the testimony elicited from the Fiscal Intermediary witnesses "require[d] [them] to apply knowledge and familiarity . . . well beyond that of the average lay person." *See Ganier*, 468 F.3d at 925; *see also Brown*, 836 S.W.2d at 550 (lay testimony is improper where it encompasses opinions that "call[] for specialized skill or expertise"). The Medicare program operates within a complex and intricate regulatory scheme and we cannot say that the average lay person, including any Medicare beneficiary, commands a working knowledge of Medicare reimbursement procedures. *Cf. United States v. Strange*, 23 F. App'x 715, 717 (9th Cir. 2001) (observing that testimony regarding Medicare regulations and reimbursement procedures was "entirely appropriate for an expert"). The Fiscal Intermediary witnesses relied to a significant degree on specialized knowledge acquired over years of experience as Medicare auditors in testifying to the structure and procedures inherent in the Medicare program, as well as their understanding of various terms. *See Cruz*, 363 F.3d at 194. An average lay person would be incapable of making sense of the various exhibits which the Fiscal Intermediary witnesses helped to clarify and link together on the basis of the "reasoning process" employed daily in their highly specialized jobs. *See Garcia*, 413 F.3d at 217. Indeed, as in *Garcia*, "the government made no attempt to demonstrate that [the witnesses'] challenged opinion[s] [were] informed by reasoning processes familiar to the average person in everyday life rather than by . . . technical, or other

---

[10]In *JGR, Inc. v. Thomasville Furniture Industries, Inc.*, 370 F.3d 519, 524 (6th Cir. 2004), a case similar to *Cedar Shipping*, we reviewed a district court's decision to admit under Rule 701 the testimony of a certified public accountant and lawyer on the loss of profits and business value incurred by the plaintiff following the defendant's alleged breach of contract. Although the challenged witness rendered accounting services to the plaintiff company, he had no ownership stake in the company, nor did he serve as an officer or director. *Id*. at 526. Because the witness relied solely on information provided by the plaintiff company to calculate projected loss, we concluded that he lacked the basis necessary to offer such lay testimony. *Id*. *JGR, Inc.* thus turned on the witness's lack of personal perception. Nevertheless, it bears noting that the accountant there contracted to provide services to plaintiff company *because of* his expertise. Additionally, he acquired this expertise not through personal involvement in the company, but through education and training.

specialized knowledge." *See id.* at 216.  Thus, the district court erred in permitting the Fiscal Intermediary witnesses to effectively testify as experts without first being qualified.[11]

Yet, such error is not in all cases reversible; rather, reversible error occurs only where the district court's erroneous admission of evidence affects a substantial right of the party. Fed. R. Evid. 103(a); *see also Whittington*, 455 F.3d at 738 (quoting *United States v. Cope*, 312 F.3d 757, 775 (6th Cir. 2002)); *Field v. Trigg County Hosp., Inc.*, 386 F.3d 729, 736 (6th Cir. 2004) (citing *Argentine v. United Steelworkers of Am., AFL-CIO*, 287 F.3d 476, 486 (6th Cir. 2002)).  "An error affects a defendant's substantial rights if it is likely to have had any substantial effect on his conviction." *Whittington*, 455 F.3d at 740 (citing *United States v. Gibbs*, 182 F.3d 408, 430 (6th Cir. 1999)); *see also United States v. Baldwin*, 418 F.3d 575, 582 (6th Cir. 2005) (quoting *Mitchell v. Esparza*, 540 U.S. 12, 17-18 (2003)) ("An error is harmless 'when it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'").  It follows, then, that our "inquiry involves an assessment of the likelihood that the error affected the outcome of the case." *Schrand v. Federal Pac. Elec. Co.*, 851 F.2d 152, 157 (6th Cir. 1988) (citation omitted).  We look, then, to "the proceedings in their entirety, in the light of the proofs at trial." *Beck v. Haik*, 377 F.3d 624, 635 (6th Cir. 2004) (internal citations and quotations omitted).

Defendants preserved their objections for appellate review by filing a motion *in limine* before trial to exclude expert testimony from the Fiscal Intermediary witnesses, and by renewing their objections outside the hearing of the jury at trial.  *See* Fed. R. Evid. 103(a).  Additionally, they timely and specifically objected at various points during the government's examination of the Fiscal Intermediary witnesses in an attempt to more narrowly cabin the witnesses' testimony.  Although the district court erred and Defendants preserved the error for review, we find Defendants' substantial rights were not harmed.

To assess the error's effect, we consider the relation of the wrongfully admitted (or excluded) evidence to the critical question for the jury, the importance of the evidence, and the closeness of the case.  *Field v. Trigg County Hosp., Inc.*, 386 F.3d 729, 736 (6th Cir. 2004).  The improperly admitted evidence here largely consisted of background information apparently intended to aid the jury in developing a basic understanding of Medicare, effectively enabling the jury members to make sense of other properly admitted evidence.  By any stretch of the imagination, this was not a close case.  In fact, the government adduced overwhelming evidence of Defendants' guilt at trial beyond that testimony erroneously admitted by the district court.  *See Whittington*, 455 F.3d at 740 (finding two witnesses' "testimony alone . . . sufficient to sustain the jury verdict"); *Baldwin*, 418 F.3d at 582 (finding error harmless in face of "overwhelming evidence of guilt beyond the erroneously admitted testimony").

First, the bulk of the Fiscal Intermediary witnesses' testimony properly constitutes lay testimony since they discussed the facts as they personally perceived them while auditing the Medicare cost reports submitted by Defendants on behalf of the providers.  Those witnesses testified concerning various government exhibits, including cost reports and supporting documentation submitted for Medicare audits of Pathways, Douglas, and New Hope.  The Fiscal Intermediary witnesses additionally read from the Medicare Provider Reimbursement Manual, which had previously been admitted into evidence, those portions intended to clarify and explain the related-party rule.  Second, Feldman and De Varona testified at some length about the transactions between the Medicare providers and the various third party staffing and supply companies, and about

---

[11] On appeal, the government primarily relies on two cases to support its claim that its Fiscal Intermediary witnesses properly gave lay witness testimony – *United States v. Erickson*, 75 F.3d 470 (9th Cir. 1996) and *United States v. Gold*, 743 F.2d 800 (11th Cir. 1984).  However, both *Erickson* and *Gold* were decided before the 2000 amendments to Rule 701 and, although somewhat instructive factually, these cases do not consider whether the challenged testimony more properly fell within the ambit of Rule 702.

Defendants' involvement in those transactions and in making representations to the Medicare Fiscal Intermediaries. Third, many additional witnesses gave proper lay testimony describing the parties' interactions. Further, the government tendered a list of over three hundred exhibits to the district court prior to trial. In view of the overwhelming evidence adduced at trial, even "stripping the erroneous action from the whole," we find "the judgment was not substantially swayed by the error." *See Kotteakos v. United States*, 328 U.S. 750, 765 (1946). We turn next to the question of compliance with Federal Rule of Criminal Procedure 16.

The district court did not rule on Defendants' claims that the government rendered insufficient notice under Rule 16 because it found the Fiscal Intermediary witnesses were not "experts per se." (*See* J.A. at 909) Accordingly, we examine the government's notice only inasmuch as it informs and impacts our harmless error analysis. Federal Rule of Criminal Procedure 16(a)(1)(G) requires the government to "give to the defendant a written summary of any testimony that [it] intends to use under Rules 702, 703, and 705 of the Federal Rules of Evidence during its case-in-chief at trial" upon request. Fed. R. Crim. P. 16(a)(1)(G). The Rule goes on to require a description of "the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." *Id*. Correspondingly, for failure to comply, Rule 16(d)(2)(C) gives the district court discretion to prohibit the introduction of the evidence. Fed. R. Crim. P. 16(d)(2)(C). Of course, Federal Rule of Criminal Procedure 16 does not require a similar response for testimony of a lay witness offered under Federal Rule of Evidence 701. *United States v. Wells*, 211 F.3d 988, 998 (6th Cir. 2000); *United States v. Perry*, 438 F.3d 642, 650 (6th Cir. 2006).

The government's notice provided Defendants pursuant to Federal Rule of Criminal Procedure 16(a)(1)(G) stated that the Fiscal Intermediary witnesses would testify along the following lines:

> They are familiar with Medicare rules, regulations, and procedures with respect to cost reporting and costs allowable as reimbursement to providers of medical services to Medicare patients. Costs reimbursed under the Medicare program include the reasonable costs actually incurred but excludes any costs unnecessary to the efficient delivery of needed health services. "Related Party" costs are only allowed for the actual cost to the party related to the provider if otherwise reasonable and necessary. A related party may include a person or entity which has significant influence over the provider. Medicare is keenly interested in knowing whether there were any costs attributable to a "related party" in order to determine what costs would be properly allowed to the provider.

(J.A. at 82) For each Fiscal Intermediary witness, the government indicated their title and employer, their contact information and, with respect to Reyes and Eve, their experience in Medicare cost report auditing. The government did not attach their resumes or any additional documentation.

The record clearly reflects that the government's Rule 16 response did not describe in great detail "the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." *See* Fed. R. Crim. P. 16(a)(1)(G). In 1993, the drafters amended Rule 16 to require such disclosure "to minimize surprise that often results from unexpected expert testimony . . . and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination." Fed. R. Crim. P. 16 advisory committee's note (1993). To that end, the summary contemplated under Rule 16(a) "should inform the requesting party whether the expert will be providing only background information on a particular issue or whether the witness will actually offer an opinion." Fed. R. Crim. P. 16 advisory committee's note (1993). "In some instances, a generic description of the likely witness and that witness's qualifications may be sufficient, e.g., where a DEA laboratory chemist will testify, but it is not clear which particular chemist will be available." *Id*. The summary of the bases of the expert's opinion must be provided

even where the proffered experts prepared no reports, and can include "any information that might be recognized as a legitimate basis for an opinion under Federal Rule of Evidence 703." *Id.* Rule 16 further gives the district court discretion to impose an appropriate remedy on the non-compliant party for violations of the Rule, including an order to permit the discovery sought, a continuance, an order precluding the party from introducing the challenged evidence, or any other just relief. Fed. R. Crim. P. 16(d)(2)(A)-(D).

Here, we find the government failed to comply with Rule 16's minimal notice requirements. First, notice of the Fiscal Intermediary witnesses' qualifications was insufficient. The government's Rule 16 disclosure included only a vague avowal of experience concerning cost report issues and Medicare audits, along with the witnesses' titles, employers, and contact information. This case is not like that contemplated by the Advisory Committee where a generic description of the witnesses' qualifications would suffice, as the government had already identified the witnesses. *Cf.* Fed. R. Crim. P. 16 advisory committee's note (1993). The disclosure made no attempt to quantify the witnesses' experience, nor to attach so much as a resume. *See United States v. Jackson*, 51 F.3d 646, 650-51 (7th Cir. 1995) ( finding the disclosure of witness qualifications – that opinions would be based "on their years of training and experience in the area of drug investigations" – sufficient); *United States v. Duvall*, 272 F.3d 825, 828 n.1 (7th Cir. 2001) (concluding that one sentence indicating the expert's testimony would be "based on his education, training and experience" with his employer police department and the DEA, along with a copy of his resume, "conforms to the minimum that we have found adequate"). In short, it left Defendants no better prepared to challenge the witnesses' qualifications at trial. Second, the summary of the witnesses' expected testimony was also lacking. The summary did generally inform Defendants that the witnesses would give background testimony relevant to the "Medicare rules, regulations, and procedures with respect to cost reporting and costs allowable as reimbursement to providers." (*See* J.A. at 82) Additionally, it mentioned the concepts of "reasonable costs" and "related party" costs. (*Id.*) The government's notice here essentially listed "general subject matters to be covered, but did not identify what opinion the expert would offer on those subjects." *See Duvall*, 272 F.3d at 828 (finding notice insufficient).

Notwithstanding this failure to comply, we find nothing to support reversal. *See* Fed. R. Crim. P. 52(a) ("Any error . . . that does not affect substantial rights must be disregarded."); *United States v. Basinger*, 60 F.3d 1400, 1407 (9th Cir. 1995) (citation omitted). Defendants here "did not suffer any surprise" and, on appeal, failed to "suggest how the outcome of the case would have been different" had they been provided with a more detailed summary of the Fiscal Intermediaries' testimony or documentation related to that testimony, if any. *Cf. United States v. Tarwater*, 308 F.3d 494, 515 (6th Cir. 2002) (finding no abuse in district court's decision to allow testimony notwithstanding a Rule 16 violation); *United States v. Figueroa-Lopez*, 125 F.3d 1241, 1247 (9th Cir. 1997) (finding non-compliance with Rule 16 did not affect the defendant's substantial rights as he did "not demonstrate[] how or why the verdict would have been different if he had been given notice that [the witness] planned to testify about his drug trafficking modus operandi"); *United States v. Tinoco*, 304 F.3d 1088, 1119 (11th Cir. 2002) (holding that even if the district court erred in admitting lay testimony and the government failed to comply with Rule 16's disclosure requirements, the defendants did not show how this failure "actually affected their ability to present a defense"). Indeed, Defendants undoubtedly had notice of the exhibits that the Fiscal Intermediary witnesses reviewed on the stand, including the Provider Reimbursement Manual and cost reports filed for the various providers, prior to trial. Moreover, they presumably had access to those exhibits and were prepared to cross-examine witnesses in that regard. *See* Fed. R. Crim. P. 16 advisory committee's note (1993). Defendants also put on a witness of their own – Sparks, the certified fraud examiner – to counter the testimony of the Fiscal Intermediary witnesses. As previously discussed, those witnesses primarily gave proper lay testimony, and only part of their testimony required qualification as an expert. Finally, to the extent that the testimony of the Fiscal Intermediary witnesses could be taken to support an inference that Defendant White knew of the related party

rule, other evidence at trial served the very same purpose.[12]  Consequently, we hold Defendants' substantial rights were unaffected by the district court's error.

## III.    DEFENDANTS' MOTIONS FOR NEW TRIAL

### A.    Standard of Review

We review the district court's decision to deny a motion for new trial on the basis of newly discovered evidence or *Brady* violations under an abuse of discretion standard.  *Frost*, 125 F.3d at 382; *United States v. Jones*, 399 F.3d 640, 647 (6th Cir. 2005).  The district court abuses its discretion when it relies on clearly erroneous findings of fact, uses an erroneous legal standard, or improperly applies the law.  *United States v. Heavrin*, 330 F.3d 723, 727 (6th Cir. 2003).

### B.    Motion for New Trial

On appeal, Defendants argue that the district court erred in denying their motions for new trial, made on the basis of newly discovered evidence.  In the alternative, Defendants argue that the district court erred in declining to hold an evidentiary hearing on their *Brady* claim.[13]  Defendant White refers to (1) allegedly exculpatory information Weir (former CEO of YOH) communicated to the government during the trial, and (2) information reviewed and produced by Potter, the fraud examiner who had purportedly worked on Defendants' case but who was not introduced as a government witness ("the Potter materials").  Defendant Suhadolnik primarily relies on the Potter materials.  We find the district court abused its discretion in failing to conduct an evidentiary hearing to explore the nature of the Potter materials.

Following conviction but before sentencing, Defendants learned that Potter, the government's "potential" witness in this case, had received an award for fraud examination and, among his list of "successful cases" had cited the convictions of Defendant White and DeVarona.  Defendants White and Suhadolnik brought a motion to compel Potter to produce any documents he reviewed at the government's request in preparing to testify and to appear for examination.  The district court denied the motion, finding Defendants had no "right to discovery of a witness who was not called at trial absent *Brady* material."  (J.A. at 40)  Post-trial, Defendant White filed a FOIA request with HHS seeking any documents "created, prepared by or received by IntegriGuard [Potter's employer] . . . [or] Charles Potter" with respect to Defendants' cases.  (J.A. at 247)  Defendant White received a response on January 10, 2005 indicating that the request yielded 57,436 pages of documentation, which White could not afford to obtain because of the duplication fee.

On February 4, 2005, Defendants White and Suhadolnik filed a motion for new trial on the basis of newly discovered evidence.  The district court denied this motion.  On September 15, 2005,

---

[12]For example, a substantially redacted version of Defendant White's deposition transcript from a related civil case (*Youngstown Osteopathic Hosp. v. Pathways Center*) was admitted into evidence as Government Exhibit 224.  (*See* J.A. at 101-A, 1733)  Therein, Defendant White stated that his involvement in healthcare began in 1966, and that he "wrote the original Medicare audit program and did the first Medicare audit that was ever done in the U.S.," adding "I been with Medicare longer than I care to remember."  (J.A. at 1764)

[13]Defendant Suhadolnik's brief on appeal also recasts this issue as a violation of his Sixth Amendment Right to Present a Defense.  It is, however, more properly treated here, as part of his challenge to the district court's denial of a motion for new trial.  We note additionally that Defendant Suhadolnik advances a rather perfunctory argument that cumulative trial errors violated his due process rights, requesting this Court "to review the entire trial," but failing to cite specific errors save the newly discovered Potter evidence.  We deem Defendant Suhadolnik's argument that cumulative errors violated his due process rights waived.  *See Moore v. LaFayette Life Ins. Co.*, 458 F.3d 416, 448 (6th Cir. 2006) ("[The courts of appeals] are not self-directed boards of legal inquiry and research, but essentially arbiters of legal questions presented and argued by the parties.") (internal citations omitted).

counsel for Defendant Suhadolnik submitted a separate FOIA request to HHS. In response, HHS disclosed an allegedly altered version of an expert reported prepared by Defendant's expert, Sparks. Exculpatory opinions and conclusions had been extracted from the report before it was allegedly given to Potter for review. Defendant White's counsel also submitted a revised FOIA request, and in response HHS produced copies of e-mail communications indicating that Potter had worked on the case. Additionally, HHS identified 42 pages responsive to the request, but entirely withheld 24 of them.

Working in conjunction with Defendants even after their convictions, Sparks avers that she made a FOIA request with IntegriGuard, to which it identified 400 responsive documents. Of those, IntegriGuard sent only a few. In the documents produced to Sparks, she identified that the version of her expert report provided by CMS to Potter had been edited to exclude opinions, bases, and testimony exculpatory to Defendants. Sparks further filed FOIA requests with CMS. CMS responded by sending 16 of 70 pages to Sparks and withholding 54 pages entirely. A letter from CMS indicates that 46 documents were withheld due to privilege, as they "constitute internal agency communications that are both predecisional . . . and deliberative." (J.A. at 407-08) CMS further withheld 8 pages which contained Potter's resume and biography, citing an exemption set forth in 5 U.S.C. § 552(b)(6), which permits withholding of "personnel . . . files," among other things. (J.A. at 408)

Among the documents Sparks received was the allegedly edited version of her expert report. When Sparks contacted CMS to obtain the additional 8 pages of the report – or an explanation – she received a phone call from CMS indicating that the agency had provided her "with the exact same expert report that IntegriGuard provided [their] office." (J.A. at 429) Apparently, after following up with IntegriGuard, Sparks learned that the edited version had been given to them by the Assistant U.S. Attorney working with CMS. On that basis, Defendants again moved for a new trial, and in the alternative for an evidentiary hearing, alleging *Brady* violations. The district court again denied the motion, and Defendants appeal that denial.

Prosecutorial suppression of evidence favorable to the accused implicates the Due Process Clause of the Fifth and Fourteenth Amendments. In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the Supreme Court held that, where the accused makes a pre-trial request for evidence favorable to his case, the government violates his due process rights in suppressing such evidence "where [it] is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." It matters little whether the government suppresses the evidence out of oversight or guile. *Id.* at 88; *see also Giglio v. United States*, 405 U.S. 150, 154 (1972); *United States v. Agurs*, 427 U.S. 97, 110 (1976) ("Nor do we believe the constitutional obligation is measured by the moral culpability, or the willfulness, of the prosecutor."). Exculpatory evidence and impeaching evidence alike can be "favorable to [the] accused" within the meaning of *Brady* and the defendant need not show the evidence would likely lead to acquittal. *United States v. Bagley*, 473 U.S. 667, 676 (1985); *Giglio*, 405 U.S. at 154; *Agurs*, 427 U.S. at 111; *Frost*, 125 F.3d at 382.

Rather, the evidence must be material. "The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt." *Agurs*, 427 U.S. at 112. Accordingly, the "touchstone of materiality" is "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682 (plurality); *Kyles v. Whitley*, 514 U.S. 419, 434 (1995); *see also Giglio*, 405 U.S. at 154; *Jones*, 399 F.3d at 648. Further, whether the accused requests the suppressed evidence – in words however broad – or makes no request at all, the government nevertheless has a duty to disclose material evidence. *Bagley*, 473 U.S. at 676; *Strickler v. Greene*, 527 U.S. 263, 280 (1999); *Frost*, 125 F.3d at 382. As the Supreme Court recently summarized, a "true *Brady* violation" has three aspects. *Strickler*, 527 U.S. at 281. "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State,

either willfully or inadvertently; and prejudice must have ensued." *Id*. at 281-82. A deprivation of due process occurs where all three aspects are present.

However, *in camera* review of the evidence sought may be appropriate upon a lesser showing. In *Pennsylvania v. Ritchie*, 480 U.S. 39, 43 (1987), a defendant charged with sexually abusing his daughter sought access to her Children and Youth Services (CYS) records during pretrial discovery. The state refused access, and the defendant charged that the state thereby violated his Sixth Amendment rights because the records could contain exculpatory evidence or leads to favorable witnesses. *Id*. at 44-45. The Supreme Court construed the defendant's challenge as a Fourteenth Amendment Due Process claim and applied the "clear framework" of *Brady* and its progeny to assess the fundamental fairness of the defendant's trial. *Id*. at 56. There, the Court stated:

> At this stage, of course, it is impossible to say whether any information in the CYS records may be relevant to Ritchie's claim of innocence, because neither the prosecution nor defense counsel has seen the information, and the trial judge acknowledged that he had not reviewed the full file. The Commonwealth, however, argues that no materiality inquiry is required, because a statute renders the contents of the file privileged.

*Id*. at 57. As a result, the Court found remand for *in camera* review of the file appropriate and necessary to the district court's "determin[ation] whether it contains information that probably would have changed the outcome of [the defendant's] trial." *Id*. at 58. Notably, the Court did not hold that the government must give defense counsel unbridled access to the information; only that the court be permitted to examine it. *Id*. at 58-59. Accordingly, once a defendant "establish[es] a basis for his claim that [the records sought] contain[] material evidence," even though he cannot articulate with specificity the materiality of those records, remand for *in camera* review may be appropriate.[14] *See id*. at 58 n.15.

In *United States v. Hernandez*, 31 F.3d 354, 360 (6th Cir. 1994), the defendant alleged a *Brady* violation when the government filed a sealed document the day before sentencing in relation to a co-defendant who had pled guilty and testified against him. The district court declined to review the document *in camera* prior to sentencing, relying on the prosecutor's statement that he had reviewed the document and it contained no *Brady* material. *Id*. at 360-61. Acknowledging the prosecutor's role as a representative of the United States, we found no abuse of discretion in the district court's decision not to review the document *in camera* inasmuch as "*absent some indication of misconduct*, the court is entitled to accept [the prosecutor's] representations on this issue." *Id*. (emphasis added). Notably, in *Hernandez*, the prosecutor made no attempt to conceal its plea deal with the co-defendant and the jury had been informed of the details of that deal. *Id*. In *United States v. Carmichael*, 232 F.3d 510, 516-17 (6th Cir. 2000), we reaffirmed the principle that where the prosecutor clearly represents to the district court that all *Brady* material has been disclosed to the defendant, there exists no basis to require an *in camera* review by the district court.

---

[14]Our sister circuits have signaled approval of remand for *in camera* proceedings to ascertain the materiality of the evidence sought in various circumstances. *See United States v. Kiszewski*, 877 F.2d 210, 216 (2d Cir. 1989) (finding remand for *in camera* examination of an FBI agent witness's personnel files appropriate because they "ha[d] only the government's description of the allegations contained" therein); *United States v. Leung*, 40 F.3d 577, 582 (2d Cir. 1994) ("[I]n some circumstances the trial court should not rely on the Government's representations as to the materiality of potential impeachment evidence, but should instead undertake an independent *in camera* review . . . ."); *Anderson v. United States*, 788 F.2d 517, 519 (8th Cir. 1986) ("Whether the statements were material to [the defendant's] guilt or punishment is a question that the district court should have determined by reviewing the tapes and the polygraph statements *in camera*.").

*Hernandez* and *Carmichael* do not control the instant case. Very clearly, the prosecutor here made misrepresentations to the district court. Prior to trial, the government did not provide Defendants with any documents produced by or given to Potter because, the government says, they were not "material." Defendants learned of Potter's assistance to the government only after trial when industry publications touted his successful investigation in their case. Defendants promptly brought a motion to compel production of "any and all information surrounding Mr. Potter's services" regarding their cases at that time. In his response to Defendant White's Motion to Compel, the government responded that it "(to the best recollection of [the Assistant United States Attorney ("AUSA")]) contacted Mr. Potter to discuss the potential of his rendering an opinion regarding 'related parties,' but *never asked him to review evidence*." (J.A. at 617 (emphasis added)) The AUSA later reversed course, indicating in his response to Defendant White's second motion for a new trial

> The government did, in fact, inaccurately state, in its response (filed on October 6, 2004) to the defendant White's Motion to Compel production of records, that it had sent no material to Charles Potter. At that time, the undersigned counsel had simply forgotten that he had sent a redacted version of the report prepared by Eva Jo Sparks to Mr. Potter.

(J.A. at 812) Notwithstanding the AUSA's admission, the government and Potter alike have persistently given incomplete responses to Defendants' FOIA requests citing privilege as the reason.

Over the course of a complex fraud trial, it is not beyond the pale that the AUSA inadvertently failed to disclose the material at issue. Having failed to disclose the material it sent to Potter – whether intentionally or inadvertently – the AUSA now asks this Court to take his word that the evidence was not favorable to Defendants, was not material to their respective cases, and that its suppression did not prejudice them in any way. As the Supreme Court has stated time and again,

> the United States Attorney is 'the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.'

*Strickler*, 527 U.S. at 281 (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)); *see also Kyles*, 514 U.S. at 439 (noting that proper "disclosure will serve to justify trust in the prosecutor"). The United States Attorney's word is worth considerably less when, as here, it is manifest that he made conflicting representations to the court below.[15]

In *United States v. Alexander*, 748 F.2d 185, 187, 191 (4th Cir. 1984), the Fourth Circuit considered the *Brady* claim of a doctor convicted of submitting fraudulent claims to various insurers, including Medicaid and the military health plan. The doctor's pretrial discovery request broadly sought "all documents 'which refer or relate to the claim forms of Blue Cross/Blue Shield.'" *Id.* at 191. The government had command of a Blue Cross/Blue Shield patient survey which, among other things, contained "patient responses . . . concerning whether services . . . submitted [for payment] . . . had actually been performed." *Id.* The survey revealed that only thirteen out of forty-eight patients reported the services submitted had *not* been performed. *Id.* Following the doctor's conviction, he again requested the survey or, alternatively, the identity of the patients surveyed. *Id.* at 192.

---

[15]Incidentally, confidence in the AUSA is not restored by the use of language characterizing *Brady* allegations as "bogus speculations" or "cries of 'fowl,'" [sic] nor by rhetorical questions intended to belittle such claims (*e.g.*, "So What?"). (*See* J.A. at 617-20)

Attempts to secure voluntary disclosure failed, and the district court denied a subsequent motion for discovery, proceeding to hear the doctor's motion for new trial. *Id.* Before hearing on that motion, the government represented to the doctor that it never had the survey results in its possession. *Id.* During the hearing, however, the government changed course, telling the court that it *did*, in fact, have the survey results at the time the doctor requested them, but that they had given the doctor access to the survey results in files open for the doctor's counsel to inspect. *Id.* The government told yet another story at oral argument on appeal, then representing that Blue Cross/Blue Shield maintained control of the survey at the relevant time. *Id.* In an investigative case summary submitted at the court's request, the Fourth Circuit then learned that the government did have the survey materials at the relevant times. *Id.*

The Fourth Circuit in *Alexander* found "the Government's equivocation in making critical factual representations to defense counsel and to the district court concerning its possession of certain of the requested materials fatally compromised the integrity of the proceedings on the new trial motion." *Id.* at 191. Accordingly, they remanded to the district court, directing it to reconsider the doctor's motion for new trial. *Id.* Importantly, they did so notwithstanding some question as to whether the survey actually constituted *Brady* material, noting "that neither the defendant, nor this court, nor the district court could properly address that question without inspecting the survey responses and related . . . materials that the Government now presumably concedes it has had in its possession all along." *Id.* at 193. Unlike *Alexander*, where the government's equivocation first came to light on appeal, in the instant case, the district court had full knowledge of the government's failure to produce the Potter materials. *See Alexander*, 748 F.2d at 191. Much as in *Alexander* though, the district court could not properly determine here whether the Potter materials rose to the level of material evidence, whether exculpatory or impeaching and, thus, lacked information critical to the determination of whether a *Brady* violation had occurred.

Here, the supporting evidence detailed the government's rather great lengths to deny Defendants access to the requested documents. Because Defendants succeeded in obtaining only relatively few of the documents notwithstanding their persistent and diligent attempts, the government effectively foreclosed them from making the requisite showing that the documents were material and favorable (whether exculpatory or impeaching), and that the suppression prejudiced them.[16] Admittedly, "the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial." *Bagley*, 473 U.S. at 675. Defendants have established a sufficient basis for their claim that the Potter documents constitute "material" evidence inasmuch as Potter cites their conviction among his "successes" and in that their FOIA requests reveal a substantial body of responsive documents. Upon inspection, the district court may find the Potter materials "lack . . . *Brady-Agurs* relevance," as the government claims. *See Alexander*, 748 F.2d at 193. The point, of course, is that absent more detailed examination, we cannot know whether the government violated Defendants' Fifth Amendment Due Process rights in withholding the materials. Absent a more searching inquiry of claims as serious as those lodged by Defendants here, we effectively permit the government to ride roughshod over the accused, stripping the accused of both sword and shield.

Accordingly, we find the district court abused its discretion in failing to hold an evidentiary hearing to more carefully consider the nature of the documents and the information contained therein. We vacate the district court's order denying the motion for new trial and remand this matter to the district court with instructions that the court conduct an evidentiary hearing wherein

---

[16]The district court dismissed this as a mere "fishing expedition." Yet, here, the fish swim just below the surface of the pond and, for reasons squarely within the government's control, the waters run cloudy, rendering Defendants unable to discern the nature of the fish. Defendants allege a serious constitutional violation. We will not so easily and off-handedly dismiss Defendants' claim, and the district court abused its discretion in doing so without first peering below the surface.

Defendants may properly probe the nature of the Potter evidence. The hearing should include an *in camera* inspection of additional documents withheld on grounds of asserted privilege. Following the evidentiary hearing, of course, it is up to the district court in the first instance to determine whether a *Brady* violation actually occurred. Insofar as Defendant White appeals the district court's denial of his motion for new trial on the basis of the purported Weir testimony, we find no abuse of discretion.[17] Further, because we remand for an evidentiary hearing under *Brady* and its progeny, we do not rule on Defendants' alternative claim under Federal Rule of Criminal Procedure 33.

## IV.     DEFENDANT WHITE'S SENTENCE

Defendant White raises several challenges to his sentence on appeal, including claims that (1) the district court failed to rule on a disputed portion of his Presentence Report ("PSR") in contravention of Federal Rule of Criminal Procedure 32(i)(3)(b); (2) the district court improperly calculated the amount of loss used to determine the advisory sentencing range under the United States Sentencing Guidelines ("the Guidelines"); (3) the district court abused its discretion in calculating the amount of loss used to set restitution; and (4) his sentence was unreasonable under *United States v. Booker*, 543 U.S. 220 (2005).

### A.     Standard of Review

We review the district court's compliance with Federal Rule of Criminal Procedure 32(i) *de novo*. *United States v. Bowker*, 372 F.3d 365, 393 (6th Cir. 2004), *partially vacated on other grounds*, 543 U.S. 1182 (2005) (vacated in part following *Booker*). We also review *de novo* the district court's method of calculating loss for purposes of sentencing enhancements under the Guidelines. *United States v. Triana*, 468 F.3d 308, 320 (6th Cir. 2006) (citing *United States v. Rothwell*, 387 F.3d 579, 582 (6th Cir. 2004)). However, the findings of fact underlying the district court's loss calculations – both for Guidelines enhancement and restitution purposes – will be overturned only if clearly erroneous. *Id*. A finding that the calculations were clearly erroneous will follow only if this Court "on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Ware*, 282 F.3d 902, 907 (6th Cir. 2002) (citing *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). When faced with a challenge to the amount of restitution ordered, we reverse only if the district court abused its discretion. *United States v. Wood*, 364 F.3d 704, 714 (6th Cir. 2004). Finally, we review the defendants' sentences for reasonableness. *United States v. Booker*, 543 U.S. 220, 261 (2005); *United States v. Webb*, 403 F.3d 373, 383 (6th Cir. 2005).

### B.     Rule 32(i)(3)(B) and Loss Calculation

Defendant White posits that the "district court failed to meet its obligations under Fed. R. Cr. [sic] P. 32(i)(3)(B) by summarily adopting the government's factual findings concerning amount of loss" and alleges the district court abused its discretion in calculating that loss. (Def. White's Br. at 76) Additionally, Defendant White asserts that the district court failed to respond to his objections and calculations. Reviewing *de novo*, we agree with Defendant White that the district court erred in failing to explain this factual determination and erred in calculating the amount of loss.

At sentencing, the district judge began by reviewing Defendant White's PSR. There were two versions of the PSR prepared for sentencing – one based on the fraud counts, and the other based on the money laundering counts. The first PSR "used the fraud counts to establish a base offense level of 6, with an increase of 15 levels, due to the alleged loss of over $14 million,

---

[17]Defendant Suhadolnik's *Brady* claim relates only to the Potter materials.

specifically, $14,604,754."[18]    (J.A. at 1337)  After adjustments, the PSR set forth a total offense level of 29.  This yielded a Guidelines range of 78 to 97 months.  The second PSR relied on the money laundering counts, establishing "a base offense level of 23, with an increase of six levels, for a loss of $2.6 million, based on the money laundering counts." (J.A. at 1338-39)  The base level was enhanced by four levels for leadership role, and by two levels for abuse of a position of trust, resulting in a total offense level of 35.  The second PSR thus yielded an advisory Guidelines range of 188 to 235 months.  The calculation ultimately embraced by the district court, upon the government's alternative proposed loss amount, incorporates a fourteen-level enhancement to Defendant's base offense level of 6 pursuant to the Guidelines provision on loss calculation for crimes of fraud, then U.S.S.G. § 2F1.1 (1998).[19]  This is based on "loss exceed[ing] $5 million." *See* U.S.S.G. § 2F1.1(b)(1)(O).  The district judge sentenced Defendant using $7,290,202 as the loss figure.  This yielded an advisory Guidelines range of 78 to 97 months imprisonment and, ultimately, the judge sentenced Defendant to serve 90 months in prison.

### 1.    *Federal Rule of Criminal Procedure 32(i)(3)(B)*

Federal Rule of Criminal Procedure 32(i)(3)(B) requires the district court at sentencing to rule on "any disputed portion of the presentence report or other controverted matter."  As a threshold matter, the defendant must actively raise the dispute during the sentencing hearing before the district court's duty to find facts arises.  *United States v. Hurst*, 228 F.3d 751, (6th Cir. 2000); *United States v. Lang*, 333 F.3d 678, (6th Cir. 2003); *United States v. Solorio*, 337 F.3d 580, 598 n.15 (6th Cir. 2003) (noting the advisory committee revised the Rule, in part, to "narrow the requirement for court findings to those instances when the objection addresses a controverted matter") (internal quotations and brackets omitted).  Once the defendant calls the matter to the court's attention, the "court may not merely summarily adopt the factual findings in the presentence report or simply declare that the facts are supported by a preponderance of the evidence."  *Solorio*, 337 F.3d at 598 (quoting *Tarwater*, 308 F.3d at 518); *see also United States v. Monus*, 128 F.3d 376, 396 (6th Cir. 1997).  Rather, the district court must affirmatively rule on a controverted matter where it could potentially impact the defendant's sentence.  *Monus*, 128 F.3d at 396.  We hasten to note, as we have done many times, that we require "literal compliance" with this Rule "for a variety of reasons, such as enhancing the accuracy of the sentence and the clarity of the record."  *United States v. Treadway*, 328 F.3d 878, 886 (6th Cir. 2003); *see also Monus*, 128 F.3d at 396.

We hold that the district court erred in failing to explain its determination that Defendant White be held accountable for loss in the amount of $7,290,202.  Defendant White initially objected to the loss calculations put forth in his Sentencing Memorandum.  (*See* J.A. at 161 ("Defendant . . . has also objected and/o[r] disputed the actual amounts of money involved in these crimes."))  Defendant White again disputed the matter of loss calculation at his sentencing hearing, arguing that the "figure was pulled out of thin air."[20]  (J.A. at 1358)  The district court obviously heard these

---

[18]The government's sentencing memorandum proposed an alternative loss calculation of $10,261,508.  At the sentencing hearing, however, the government "suggest[ed] a more conservative basis by using a formula since some of the claims were in fact legitimate to arrive at a figure of $7,290,202." (J.A. at 1338)

[19]The calculations in the PSR reflect provisions of the 1998 version of the Guidelines.  Additionally, we note that the PSR provides two separate calculations – one based on Defendant's money laundering convictions, and the other based on the fraud counts.  The district court followed the PSR calculations for the fraud counts.

[20]We note here that Defendant White made this argument during the course of a discussion of the second PSR which reflected the money laundering charges.  However, the district court never engaged in a discussion on the record of the first PSR, upon which the district judge ultimately relied.  Accordingly, Defendant White never had the opportunity to raise the argument with reference to the first PSR.  Nevertheless, we find Defendant White sufficiently disputed the loss calculation such that the district court had a duty to find facts under Federal Rule of Criminal Procedure 32.

objections from defense counsel as to the amount of loss and, yet, failed to articulate on the record any rationale supporting her factual determination. *See United States v. Nelson*, 356 F.3d 719, 723-24 (6th Cir. 2004) (citing *United States v. Orlando*, 281 F.3d 586, 601 (6th Cir.2002)) ("[A]lthough the evidence may justify holding [the defendant] accountable for $593,366.60 in loss, the district court's failure to explain its factual determination requires . . . remand . . . for his resentencing."). On the record before this Court, it appears that the district judge blindly embraced the figures set forth in Defendant White's PSR – figures, we hasten to add, that the AUSA provided to the U.S. Probation Officer preparing the PSR. "[R]eliance on the PSR is insufficient when the facts are in dispute." *Treadway*, 328 F.3d at 886. Rather, the district court must *actually find facts*, and it must do so by a preponderance of the evidence.

### 2.    *Calculating the Amount of Loss*

We also find that the district court erred in calculating the loss. U.S.S.G. § 2F1.1 provides for an increase in a defendant's sentence corresponding to the amount of loss occasioned by his fraudulent conduct. Application Note 7 to § 2F1.1 defines "loss" as "the value of money, property, or services unlawfully taken." U.S.S.G. § 2F1.1, cmt. n.7 (1998). Note 7 goes on to discuss fraud "involv[ing] the misrepresentation of the value of an item that does have some value" and instructs that "the loss is the amount by which the [item] was overvalued." *Id.* Application Note 8 indicates that "loss need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information." *Id*. at cmt. n.8 (1998); *see also United States v. Triana*, 468 F.3d 308, 320 (6th Cir. 2006) (considering challenge to loss calculation in Medicare fraud context, but under U.S.S.G. § 2B1.1) ("In situations where the losses occasioned by financial frauds are not easy to quantify, the district court need only make a reasonable estimate of the loss, given the available information."). "Under the Guidelines, the district court is to determine the amount of loss by a preponderance of the evidence." *Triana*, 468 F.3d at 321.

In *United States v. Triana*, 468 F.3d at 310, the defendant was convicted of health care fraud, conspiracy to defraud both the Medicare and Medicaid programs, and use of a false statement, among other things. On appeal, the defendant challenged the district court's loss calculation under § 2B1.1 of the Guidelines on the basis that the court used gross Medicare receipts instead of actual losses to the Medicare program. *Id*. at 310-311. At the defendant's sentencing, the government proposed an 18-point enhancement for substantial loss to the Medicare program and, as the basis for that enhancement, suggested that the court use the total amount *billed* to Medicare by the defendant's fraudulent companies as the loss amount. *Id*. at 314. The defendant argued that his companies provided legitimate services to the Medicare patients and, accordingly, that the Medicare program had suffered no loss. *Id*. The district court ultimately set the loss amount in accordance with the total amount *received* by defendant's companies in payment of its Medicare claims. *Id.*

On appeal, this Court found no error in the district court's calculation of loss. *Id*. at 322. However, because the facts underlying the defendant's fraud conviction in *Triana* are readily distinguishable from the instant case, *Triana* cannot be taken for the proposition that the total amount paid by the Medicare program necessarily constitutes the loss amount for sentencing purposes. There, the defendant had previously pled guilty to one count of health fraud for submitting inflated bills to Medicare for reimbursement. *Triana*, 468 F.3d at 311. His plea agreement and corresponding settlement agreements with the Department of Health and Human Services (HHS) essentially precluded further participation in federal health care programs for a specified period of time. *Id.* Notwithstanding the terms of these agreements, upon release from a half-way house, the defendant formed two new companies, acquired 'puppet' owners, and through them, obtained new Medicare and Medicaid provider status. *Id*. Accordingly, because the defendant expressly violated agreements forbidding his participation as a Medicare provider, the entire amount reimbursed was improper gain. *Id*. at 322.

In our view, the Fifth Circuit recently adopted a more appropriate approach to the specific question at hand in *United States v. Jones*, 475 F.3d 701 (5th Cir. 2007), and one more closely aligned with Application Note 7 to U.S.S.G. § 2F1.1. The defendants in *Jones* pled guilty to one count of Medicare fraud each for conduct violating the "related party" rule. *Jones*, 475 F.3d at 704. Their respective PSRs listed the total amount paid by the Medicare provider to the related party which, of course, the provider paid from its Medicare reimbursements. *Id*. The defendants objected to the amount of loss listed in their PSRs. *Id.* At sentencing, the district court "accepted the PSR as evidence regarding the actual costs incurred by" the provider and, then, "reduced the loss amount by the estimated value of performed services." *Id*. Ultimately, the *Jones* court adopted a "net gain method for calculating loss" and, accordingly, found reliance on Medicare's total reimbursement costs inappropriate. *Id*. at 706. Rather, for the *Jones* court, the loss amount should be based on evidence of "amounts paid to [the related party that] were either unreasonable or greater than its actual cost." *Id*.

We agree with the Fifth Circuit's rationale in *Jones* and, to the extent practicable, adopt the "net gain" method for calculating loss where a party is convicted of Medicare fraud due to violations of the "related party" rule. *See Jones*, 475 F.3d at 706; U.S.S.G. § 2F1.1 cmt. n.7 (1998). We remain mindful of the nature of complex fraud schemes, however. As the commentary to the Guidelines instructs, "loss need not be determined with precision;" rather, the district court must "make a reasonable estimate of the loss, given the available information." U.S.S.G. § 2F1.1 cmt. n.8. The government implicitly acknowledges that the "net gain" method is the proper method in its brief on appeal where, on the basis of available evidence, it reduces loss figures by the "mark up" factor.

In any event, the government expressly concedes on appeal that the loss amount proposed and adopted by the district court was in error and, in the alternative, now claims the correct loss amount should have been $6,754,885 as opposed to $7,290,202. This follows two previous reductions in the government's proposed loss calculation – the first reduction occurring between the numbers it submitted to the U.S. Probation Officer for inclusion in the PSR and the number suggested in its sentencing memorandum, and the second between the sentencing memorandum and the figure it put forth at Defendant White's actual sentencing hearing. This only buttresses the need for the district judge, on remand, to make some record of her factual findings in support of the loss calculation, and to cite the government's evidence where appropriate. Moreover, we find nothing to preclude Defendant White from offering evidence at sentencing on remand of actual costs or comparables to aid the district court in its decision. Accordingly, we vacate Defendant White's sentence and remand to the district court for resentencing.

### C.     Loss Calculation - Restitution

We review the amount of a restitution award for abuse of discretion. *United States v. Adams*, 214 F.3d 724, 730 (6th Cir. 2000); *Wood*, 364 F.3d at 714 (citation omitted). Title 18 U.S.C. § 3663A(a)(1) directs the district court to order "that the defendant make restitution to the victim of the offense." The government bears the burden to demonstrate "the amount of loss sustained by a victim as a result of the offense." *Id*. at § 3664(e). Where proven by a preponderance of the evidence, the statute provides for "restitution to each victim in the full amount of [their] losses." *Id*. at §§ 3664(e), 3664(f)(1)(A). Thus, "the loss caused by the conduct underlying the offense of conviction establishes the outer limits of a restitution order." *Hughey v. United States*, 495 U.S. 411, 420 (1990); *see also United States v. Jamieson*, 427 F.3d 394, 418 (6th Cir. 2005); *United States v. Rothwell*, 387 F.3d 579, 585 (6th Cir. 2004).

As previously noted, the government concedes on appeal that the loss amount proposed and adopted by the district court was in error and, instead of the $7,290,202 figure employed by the district court, now claims the correct loss amount should have been $6,754,885. The district court's restitution order therefore relied upon a fact that the government now admits was clear error.

Because it was based on clearly erroneous facts, and because a restitution award may not exceed the "loss caused by the conduct underlying the offense," *see Hughey*, 495 U.S. at 420, we also find the district court abused its discretion in determining the amount of restitution.

### D.    Reasonableness under *Booker*

Having determined remand for resentencing is necessary on other grounds, we decline to engage in a protracted discussion of the reasonableness of Defendant White's sentence under *Booker* and its progeny. We note, however, our view that the district court properly acknowledged the advisory nature of the Guidelines, and the need to take the § 3553(a) factors into account. *See Booker*, 543 U.S. at 245-46; *United States v. Williams*, 436 F.3d 706, 708 (6th Cir. 2006); *United States v. Richardson*, 437 F.3d 550, 553 (6th Cir. 2006). The district court ruled that it would use the Guideline range focusing on fraud. In sentencing Defendant, the district court stated that it took into account the relevant statutory maximums and the § 3553(a) factors. In doing so, the district court stated that a sentence of 90 months "reflect[s] the seriousness of the criminal activity" and would serve as "adequate deterrence" both to Defendant White and to others. The court further indicated that it had considered the sentences imposed on White's co-defendants and distinguished their situations. Having heard Defendant's § 3553 arguments, the district court properly acknowledged the advisory nature of the Guidelines range and proceeded to specifically consider the § 3553 factors as applied to Defendant. *See United States v. Jackson*, 408 F.3d 301, 304 (6th Cir. 2005); *Richardson*, 437 F.3d at 553; *Williams*, 436 F.3d at 708.

Nevertheless, because the district court erred in failing to explain the factual determination supporting its loss calculation, Defendant White's sentence cannot be deemed "properly calculated" under the Guidelines. Even though the district court engaged in thorough review and consideration of Defendant's § 3553 arguments before issuing its sentence, the district court's loss calculation calls into question the procedural reasonableness of Defendant's sentence. Accordingly, we decline to say whether Defendant White's sentence meets the procedural or substantive reasonableness requirements of *Booker*.

### CONCLUSION

For the foregoing reasons, we **AFFIRM** Defendants' convictions; **VACATE** the district court's order denying Defendants' motions for new trial and **REMAND** for an evidentiary hearing; and **VACATE** Defendant White's sentence and **REMAND** for resentencing.

---

## CONCURRING IN PART, DISSENTING IN PART

---

ALAN E. NORRIS, Circuit Judge, concurring in part, dissenting in part. I concur in the result reached by the majority with one exception: I do not believe that remand for an evidentiary hearing with respect to the "Potter materials" is required, and I would therefore affirm the district court's denial of the motion for a new trial. While it would have undeniably been preferable for the government, in an abundance of caution, to have turned over the disputed material, as the district court pointed out in its opinion denying the motion, "it is impossible to conclude that the government's failure to turn over the altered report somehow undermines the confidence in the outcome of the trial," nor is there any indication that "Mr. Potter would have testified favorably to the defendants had he been called as a witness." Memorandum of Opinion and Order, Feb. 2, 2006, at 7.

We review the denial of a motion for a new trial based on *Brady* violations under an abuse of discretion standard. *United States v. Graham*, 484 F.3d 413, 416, (6th Cir. Apr. 20, 2007) (citing *United States v. Jones*, 399 F.3d 640, 647 (6th Cir. 2005)). Under normal circumstances, a defendant seeking a new trial based upon new evidence must show *inter alia* that the evidence would "likely produce an acquittal." *United States v. Frost*, 125 F.3d 346, 382 (6th Cir. 1997) (citing *United States v. O'Dell*, 805 F.2d 637, 640 (6th Cir. 1986)). When a *Brady* violation is alleged, however, the standard is less onerous: a defendant must only show that the favorable evidence was "material," which "does not depend upon 'whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.'" *Id.* at 382-83 (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)).

Like the district court, I believe that defendants have not shown that the materials that came belatedly to light would have undermined confidence in the verdict. On the contrary, it is more likely than not, as the district court explained, that the opinion of Mr. Potter and the materials related to its formation would have been unfavorable to defendants' position. After all, he cited this case in promoting the value of his professional services, taking "credit for the convictions." Memorandum of Opinion and Order at 7. In short, I detect no abuse of discretion on the part of the district court and would therefore affirm its denial of a new trial.